UNITED STATES of America,
Plaintiff–Appellee,

v.

Rudolph W. BEUTTENMULLER and
Larry R. Gill, Defendants–
Appellants.

No. 92–9119.

United States Court of Appeals,
Fifth Circuit.

Aug. 12, 1994.

John D. Nation, Edward W. Moore, Jr., Kuehne & Moore, L.L.P., Dallas, TX, for Beuttenmuller.

Ronald L. Goranson, Milner, Goranson, Sorrels, Udashen, Wells & Parker, Dallas, TX, for Gill.

Charles P. Murdter, Asst. U.S. Atty., Paul E. Coggins, U.S. Atty., Dallas, TX, Mark J. MacDougall, Trial Atty., U.S. Dept. of Justice, Washington, DC, for appellee.

Before GOLDBERG, JOLLY and BARKSDALE, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Rudolph W. Beuttenmuller and Larry R. Gill appeal criminal convictions arising out of their involvement in a complex real estate sales transaction involving the now-failed Shamrock Federal Savings Bank. The government contends that these defendants conspired with and aided and abetted bank officials in an illegal "cash for trash" scheme to sell—and thus remove from the bank's records—undesirable real estate owned ("REO"). Various other offenses are alleged to have been involved in the scheme, including a false entry in bank records. Shamrock

Savings, however, was legally entitled to remove through a sale property classified as REO. It was entitled to search for a purchaser willing to buy the property, to loan up to eighty percent of the purchase price in a non-recourse loan, and to arrange an exchange of equity to accomplish its goal of removing the REO from its books. The only restriction on the bank's right to remove REO was that its plan and arrangements for disposing of the REO must comply with applicable laws and regulations. Because we conclude that the government failed to prove the defendants' conduct violated laws of the United States, we reverse their convictions on all counts.

## I

In 1986, Jerry D. Lane, the chairman, president, and chief executive officer of Shamrock Savings, a federal stock savings bank with deposits insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"), realized that the savings and loan's real estate portfolio was rapidly deteriorating. In an effort to stabilize its portfolio, Shamrock Savings foreclosed on seventy-seven Austin, Texas residential lots, known as the Tanglewood property, that secured a loan accounting for more than seventy percent of Shamrock Savings' total capital.[1] Following foreclosure, the Tanglewood property was accounted for as "real estate owned," or "REO," on the balance sheet of Shamrock Savings. Not surprisingly, such a large amount of REO caused an accounting problem for Shamrock Savings. If the Tanglewood property remained classified as REO at the end of the fiscal year, which would close on September 30, Shamrock Savings would be required to create on its balance sheet a substantial reserve against capital. Consequently, Shamrock Savings began looking for a buyer for the Tanglewood property in order to reduce the value of the REO account—an acceptable procedure for the bank to follow so long as requirements of banking regulations were met.

Meanwhile, two investors previously unconnected with Shamrock Savings, Larry Gill and Richard Billings, were experiencing their own financial difficulties. Gill and Billings were investors who formed a joint venture, known as the Mansfield 150 Joint Venture, to manage and develop approximately 155 acres of vacant agricultural land in Mansfield, Texas (referred to hereafter as the "Mansfield property"). The Mansfield property was encumbered by several deeds of trust, securing in excess of $2,220,000 in mortgage and related debt.[2] Gill and Billings were personally liable for a substantial portion of this debt, and, because the property itself generated no income, Gill and Billings were required to make interest and principal payments from personal resources.

During the summer of 1986, Gill and Billings were seeking an investor or lender to relieve them of the Mansfield property's crushing debt. Gill and Billings unsuccessfully contacted more than fifty potential investors without success. Eventually, Gill contacted Jack D. Franks, a real estate consultant, broker, and speculator with ties to numerous thrift institutions.[3] Franks, on behalf of Gill and Billings, began negotiations

---

1. At the time of foreclosure on September 1, 1986, principal and accrued interest on the defaulted loan totalled $2,464,000.

2. Gill and Billings originally purchased a 150-acre tract that later became known as the Mansfield property for $1,875,000. Soon thereafter, they purchased an adjoining 5.7 acres for $130,393. This adjoining 5.7-acre property provided valuable highway access to the remaining 150 acres, thus, increasing the overall value of the combined tracts. Additionally, Gill and Billings began meeting with the planning and zoning commission, city engineers, and ultimately the City Council in an effort to rezone the property. After rezoning, the Mansfield property's appraised value was over $4 million. *See infra* note 5.

3. At trial, government witnesses testified that Franks was known in the industry as "Mr. Fix-it" for his ability to locate investors and buyers. Franks pleaded guilty to charges of unlawful participation in a transaction involving a financial institution wholly *unrelated* to Shamrock Savings. Pursuant to a plea agreement in connection with that unrelated transaction, Franks agreed to testify at any trial concerning any matter of which he had been involved—irrespective of whether his conduct in any particular matter was proper or improper. The government has *not* accused Franks of any improper conduct in this case.

with Shamrock Savings through Jerry Lane in hopes of persuading Shamrock Savings to invest in the Mansfield joint venture. A series of meetings and conferences were held during July and August, involving Lane, Franks, Gill, and Billings. These meetings and conferences resulted in the following transaction:

(a) Shamrock Land, a wholly owned subsidiary of Shamrock Savings, would pay $753,290.63 [4] in cash to the Mansfield 150 Joint Venture for a forty-five percent (45%) equity interest in the joint venture. The sole asset of the joint venture was the Mansfield property, which, at the time of the transaction, had an appraised value of approximately $4 million.[5]

(b) As part of the consideration for the interest in the Mansfield joint venture, Shamrock Land had a non-recourse obligation to pay all future financing payments of the Mansfield 150 Joint Venture arising out of the Mansfield property, including all principal and interest due on its outstanding debt obligations, which would be repaid to Shamrock Land upon sale of the property.[6]

(c) As partial payment for their equity in the Mansfield property, both Gill and Billings would receive $50,000 each in cash at closing.[7]

(d) Franks would receive a finder's fee of $50,000 in return for his services. This fee was to be paid at the closing of the Mansfield property transaction out of the $753,290.63 paid by Shamrock Land.

(e) After closing the Mansfield transaction, Gill and Billings, through the newly created Southmeadow Joint Venture, would buy the Tanglewood property, which had an appraised value of approximately $2.9 million, from Shamrock Savings for $2,725,000.

(f) Of the $753,290.63 paid by Shamrock to the Mansfield 150 Joint Venture for the Mansfield property, $555,000 would be

4. The $753,290.63 cash payment, which constituted only part of the total consideration paid by Shamrock, was "backed into" to provide sufficient cash to complete the sale of the Tanglewood property and cover other necessary expenditures associated with the sale. This cash payment provided $555,000 as an approximately twenty percent (20%) down payment necessary to allow Shamrock Savings to record a sale of the Tanglewood property. The remaining balance was applied to (a) cash payments to Gill and Billings for their equity interests in the Mansfield property ($50,000 each); (b) the finder's fee to Franks ($50,000); (c) expenses incurred by Gill and Billings in connection with the transaction ($34,509.63); and (d) title insurance premiums ($13,781.00).

5. Gill and Billings first had the Mansfield property appraised in March 1986, long before Gill and Billings came into contact with Jerry Lane and Shamrock Savings. Kelly Miller, a licensed appraiser, stated in his appraisal that the property was worth $7,123,000. Later that year, in September, Gill and Billings sought an updated appraisal in preparation for the September 30th closing with Shamrock Savings. Miller, whose professional competence was never questioned, reappraised the property, again concluding that it was worth $7,123,000. There has been no suggestion at trial or on appeal that the appraisals are not an arms length, professional assessment of the property. Although the $7,123,000 figure was the only dollar valuation contained in the appraisals, there was some question raised at trial concerning whether this $7 million valuation was based on the present condition of the property, or whether it was based on the assumption that additional improvements would be made. At trial, Miller roughly estimated that those improvements could possibly cost between $1 to $3 million. Because we must view the evidence in the light most favorable to the prosecution, we will assume that the property had a net appraised value of $4 million. These appraisals and this testimony are the only evidence appearing anywhere in the record of the dollar value of the property at the time of the transaction in question. Thus, there is no evidence that would allow a rational jury to conclude beyond a reasonable doubt that the property was worth less than $4 million.

6. Under the terms of the joint venture agreement entered into by Gill, Billings, the North Star Group (Franks), and Shamrock Land, upon sale of the Mansfield property, the proceeds would first pay off any indebtedness on the property and expenses associated with the sale. Any remaining proceeds would then first be distributed to Shamrock Land to compensate it for its initial $753,290.63 investment, and for any payments made on the indebtedness. Any remaining proceeds would then be divided among the joint ventures according to the formula contained within the joint venture agreement.

7. No one argues that it would be improper or unlawful for Gill and Billings to receive $50,000 as partial payment for their equity in Mansfield property.

paid back to Shamrock Savings as a twenty-percent (20%) down payment on the Tanglewood property. The balance of the $2,725,000 purchase price would be paid through a $2,500,000 non-recourse loan for which neither Gill nor Billings would have personal liability. This non-recourse loan included an interest reserve of approximately $330,000.

(g) Shamrock Homes Construction, a newly organized wholly owned subsidiary of Shamrock Land, would market the residential lots that make up the Tanglewood property after the sale of the property to Gill and Billings even though Shamrock had no further property interest in the Tanglewood property. All expenses associated with the maintenance and marketing would be paid by Shamrock Homes. Proceeds from the sale of any of the Tanglewood lots would be used to reduce the balance of the loan held by Shamrock Savings.

In preparation for the closing of the sales transaction and after completing the negotiations among the parties, Lane retained Beuttenmuller, a partner in the law firm of Gregory, Self & Beuttenmuller, to prepare all the necessary documentation for the transaction. Beuttenmuller structured the closing so that Shamrock Land would first purchase the interest in the Mansfield 150 Joint Venture. After completing that portion of the transaction, the parties would then complete the sale of the Tanglewood property. All would occur at Beuttenmuller's offices on September 30, 1986, the last day in Shamrock Savings' fiscal year.

On the day of the closing, it became clear that all would not go as originally planned. At the closing, Franks increased his finder's fee from $50,000 to $100,000, a move that required Shamrock to supply an additional $50,000 cash at closing. In an effort to avoid the need for Shamrock to bring additional cash to the closing table, Beuttenmuller suggested that Billings receive the $50,000 he was slated to receive for his equity interest

in the Mansfield property as a real estate commission on the Tanglewood property. The parties agreed to this and several other minor changes, and they signed the settlement statements. In addition to the settlement statements, the parties also executed a letter agreement concerning the Bank Tying Act.[8] This letter agreement, which was intended to preclude Gill and Billings from later suing Shamrock Savings under the Tying Act, described Shamrock payment to the Mansfield 150 Joint Venture and the contemporaneous purchase of the Tanglewood property as a "single integrated exchange transaction."

After completing the closing, Beuttenmuller forwarded the settlement documents to Southwest Title with escrow instructions. He also delivered to Lane a binder containing copies of the closing documents for the Mansfield property. This binder contained, along with the other closing documents, a copy of the letter agreement. Beuttenmuller sent a separate binder containing the closing documents for the sale of the Tanglewood property. This Tanglewood binder included the settlement statement reflecting the $50,000 "brokerage commission" to Billings, but did not contain a copy of the letter agreement expressly tying the two transactions together. Both closing binders were placed among Shamrock Savings' records and they served as a primary source of information to bank personnel, auditors, and examiners.

As a direct result of the Tanglewood/Mansfield transaction, Shamrock Savings completed its fiscal year reporting an after-tax income of over $600,000. The $163,000 profit reported by Shamrock Savings in connection with the sale of the Tanglewood property to Gill and Billings through the Southmeadow Joint Venture accounted for approximately twenty-five percent (25%) of consolidated income for the year.

Pursuant to the obligations it had undertaken at the closing, Shamrock Land paid the interest and expenses associated with the Mansfield property. Shamrock Homes also paid all the sales and maintenance expenses

8. The Bank Tying Act is a federal statute that permits bank customers to seek civil damages when one transaction is conditioned on the customer's willingness to complete a second transaction with the same institution.

associated with the Tanglewood property, even though that property was owned by Gill and Billings through the Southmeadow Joint Venture. While Billings had virtually no involvement with the property, Gill executed the necessary documents as individual lots were sold by Shamrock Land to other third-parties.

Approximately two years later, on October 14, 1988, the FSLIC declared Shamrock Savings insolvent and closed the bank. At the time Shamrock Savings was declared insolvent, the investment in the Mansfield 150 Joint Venture was included among Shamrock Savings' assets. At that point, Shamrock Land had paid approximately $1.4 million in loan payments, general expenses, and marketing expenses associated with the Mansfield property. Shamrock Savings eventually foreclosed on the Tanglewood property, and at the time the bank failed, the Tanglewood property was again classified as REO.

## II

On March 19, 1992, Gill, Beuttenmuller, and Lane were indicted for alleged criminal conduct related to the Tanglewood/Mansfield real estate transaction. Gill was charged with one count of conspiracy to defraud the United States, to defraud a federally insured financial institution, to make false entries on the books of such institution and to misapply funds of the institution. He was further charged with two counts of bank fraud, and two counts of misapplication of funds belonging to Shamrock Savings, and aiding and abetting bank fraud and misapplication of funds. Beuttenmuller was also charged with one count of conspiracy, and with one count of false entry in credit institution reports, and aiding and abetting false entry. Lane was charged with one count of conspiracy, two counts of bank fraud, two counts of causing false entries to be made, and two counts of misapplication of funds. Gill and Beuttenmuller both pleaded not guilty. Lane, however, pleaded guilty to the one false entries count.[9]

Gill and Beuttenmuller were tried before a jury. The jury convicted Beuttenmuller of conspiracy to commit bank fraud, and aiding and abetting a false entry in credit institution reports. Although the jury acquitted Gill of the conspiracy charge, the jury convicted him of aiding and abetting bank fraud and aiding and abetting misapplication of bank funds. The district court sentenced Beuttenmuller to two nine-month prison sentences, to run concurrently, and a $50,000 fine. Gill was sentenced to sixteen months imprisonment and a $50,000 fine. Both defendants appeal, arguing that the evidence is insufficient to support their convictions.[10]

## III

### A

First, Beuttenmuller contends that there was insufficient evidence to allow the jury to convict him for conspiracy to defraud the United States in violation of 18 U.S.C. § 371.[11] The standard of review of a sufficiency of the evidence claim relating to a criminal conviction is whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Kindig*, 854 F.2d 703, 706–07 (5th Cir.1988). A verdict must be upheld if there is substantial evidence to support it. *Id.* at 707. To establish a violation of § 371, the government must prove beyond a reasonable doubt 1) that two or more people agreed to

9. In exchange for his guilty plea to this and other charged offenses, Lane received a five-year prison sentence and a $100,000 fine. He also agreed to testify at Gill and Beuttenmuller's trial as a government witness.

10. Beuttenmuller and Gill both presented additional arguments. However, in the light of our disposition of the sufficiency of the evidence issue, it is unnecessary to consider those arguments.

11. Section 371 states in pertinent part that

[i]f two or more persons conspire to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 371 (1966).

pursue an unlawful objective; 2) that the defendant voluntarily agreed to join the conspiracy; and 3) that one or more of the members of the conspiracy performed an overt act to further the objectives of the conspiracy. *United States v. Tullos,* 868 F.2d 689, 693 (5th Cir.), *cert. denied,* 490 U.S. 1112, 109 S.Ct. 3171, 104 L.Ed.2d 1033 (1989).

■ The government argued to the jury and argues to us on appeal that the unlawful objective of the conspiracy was to conceal the true nature of the Tanglewood REO by disposing of it through an illegal "cash for trash" transaction.[12] In this transaction, the government argues, Gill and Billings had no legitimate role, but acted only as "straw men" through which Shamrock Savings could sell its REO by providing all of the money for the sale. Beuttenmuller contends, however, that there is insufficient evidence in this record to allow a rational fact finder to conclude that these transactions were part of an illegal scheme. Consequently, he argues that because the underlying transaction was not proved illegal, there is insufficient evidence that would allow a jury to conclude that he had agreed to pursue an illegal objective.

A "cash for trash" scheme is an illegal scheme that allows an institution to sell REO that has been wholly financed in violation of banking regulations that require at least a twenty percent down payment. Although

there are no cases giving a precise definition, as we understand the term from this case and other cases, a "cash for trash" transaction is a transaction in which an institution effectively *gives* cash to somebody—usually in the form of a loan—to be applied as a down payment on the purchase of the institution's REO.[13] "Cash," of course, refers to the money provided to the purchaser of REO while "trash" refers to the property classified as REO. *See also United States v. Best,* 939 F.2d 425, 426 (7th Cir.1991) (en banc), *cert. denied,* —— U.S. ——, 112 S.Ct. 1243, 117 L.Ed.2d 476 (1992) (involving a scheme where the institution gave money to borrower in form of loan and that money was tendered back to the institution as a down payment on REO, thus, resulting in 100 percent financing).

In this case, there is insufficient evidence to allow a jury to convict on the government's theory that the Mansfield/Tanglewood transaction amounted to a "cash for trash" scheme. As noted above, a jury could conclude that this transaction was a "cash for trash" scheme only if Shamrock Savings effectively gave Gill and Billings the down payment money. The undisputed evidence, however, demonstrates that Shamrock did not *give* Gill and Billings the REO down payment money; instead, Shamrock tendered approximately $753,000 *in exchange for* a forty-five percent interest in the Mansfield property.[14] Gill and Billings then, in

---

12. The government is not precise in its articulation of the unlawful objective of the conspiracy. Although at one point in its brief, it states that the illegal conduct is "that the Mansfield–Southmeadow deal was a sham designed to move the Tanglewood lots off of Shamrock's books as REO and conceal the property's true nature from federal regulators," the government's argument is that the illegality of the conspiracy is established by the conspirators conspiring to have Shamrock pay its own cash for its own "trash." Pointing to the legal requirement that Shamrock could finance no more than eighty percent of the purchase price of the REO, the government contends that all of the money used for the purchase of the Tanglewood REO came from Shamrock Savings, and that Gill and Billings brought nothing of value to the closing table. The government does not argue that any other circumstances of the removal of the Tanglewood REO from Shamrock Savings's books constituted a violation of then-existing regulations. Thus, whether the theory that underlies all of the con-

victions in this case can be sustained—excluding Beuttenmuller's false entry conviction—depends upon whether the government proved beyond a reasonable doubt that the Mansfield portion of the transaction was "cash for trash."

13. At trial, a government *witness* defined a "cash for trash" transaction as a transaction where "a lender ... would furnish financing for either the acquisition or refinancing of a person's property provided that a portion, if not all, of those funds were *utilized in the acquisition* of a problem loan or an REO on the books of that lender." A defense witness described the transaction as "*giving* somebody some money to buy something that you want to get rid of real bad." (Emphasis added).

14. To be precise, Shamrock Land purchased a forty-five percent interest in the Mansfield 150 Joint Venture. The sole asset of the joint venture was the Mansfield property. Thus, in effect,

turn, tendered a portion of that money as a down payment on the Tanglewood property, Shamrock Savings' REO. Thus, the pivotal issue in this case is whether there was sufficient evidence to allow a jury to conclude—beyond a reasonable doubt—that the Mansfield portion of the transaction was *not* within the range of a value-for-value transaction; if the Mansfield portion of the transaction was not, then Shamrock Savings effectively gave Gill and Billings the REO down payment money.

There are two scenarios in which a jury rationally could conclude that the sale of the Mansfield property was not a value-for-value transaction: (1) if the Mansfield property had *no* value; or (2) if the value of the Mansfield property was so low that the transaction was essentially a sham designed to cover the fact that Shamrock Savings was gratuitously providing Gill and Billings with the down payment money for the purchase of REO. The *only evidence* in this record concerning the dollar value of the Mansfield property demonstrates that, at the time of the transaction, the property had an appraised value of at least $4 million. The government offered no evidence that the Mansfield property had no value, or that it was so valueless that the transaction was a sham.[15] This record demonstrates that a reasonable fact-finder could not find beyond a reasonable doubt that Shamrock Savings did not receive valuable consideration in exchange for the $753,000 it paid to Gill and Billings. Gill and Billings then used a portion of the money from that sale to make a down payment, resulting in a twenty percent down payment on the REO, which complied with banking regulations. The objective of a "cash for trash" scheme is for an institution to remove REO from its books by illegally providing full financing of a purchase price of REO, including the required twenty percent down payment—which indeed was the contention of the government in this case at trial and on appeal.[16] The transaction in this case was not "cash for trash" because the purchase of the Tanglewood REO was not illegally financed by Shamrock Savings.[17] Be-

Shamrock Land purchased a forty-five percent interest in the land itself. For our purposes today, we will refer to this transaction as a purchase of a percentage of the real estate.

**15.** Even if the jury accepted the lowest possible appraised value in the record—$4 million—the property still had approximately $1.8 million in equity value ($4 million net appraised value less $2.2 million in debt secured by the property) on the date of the transaction, September 30, 1986. Of this $1.8 million in equity, the joint venture agreement [Govt Exhibit 154] mandated that Shamrock receive the full return of its $753,290 initial cash investment plus any payments it made on the non-recourse note before any amount of the equity was divided among the joint venturers. Thus, under the least favorable scenario presented to the jury, at a bare minimum, Shamrock received dollar-for-dollar value in exchange for its $753,290 cash payment to the joint venture.

**16.** There is no dispute that a bank can legally remove REO from its books by selling the property. To legally sell REO, a bank must receive the required down payment, typically at least a twenty percent of the purchase price. Once the bank receives the required down payment, the bank may legally finance the remaining purchase price.

**17.** The dissent argues that the jury could reasonably infer the that the Mansfield property was worth something less than $4 million. To sup-

port this contention, the dissent makes several arguments. First, it attacks the appraisal, stating that the jury might have decided that it was "ridiculously speculative." Although there was some question concerning the appraised value at trial, no evidence was introduced that could reasonably lead a jury to conclude that the appraisal was so flawed or otherwise invalid that the jury could ignore it altogether. Next, the dissent cites the general maxim that property is worth only what a buyer is willing to pay, noting that Gill and Billings were unable to find a willing buyer or investor for the Mansfield property—other than Shamrock Savings—in a relatively short period of time. It then concludes that this inability to locate a willing buyer greatly reduced the value of the property. Neither the jury nor the dissent, however, can rely on maxims as evidence. Nor does the real estate profession rely on maxims to establish property values; instead it looks to appraisals to determine what a willing buyer would pay. In this case, the only *evidence* in the record demonstrates that the Mansfield property had an appraised value of at least $4 million at the time of the transaction. This $4 million evaluation would have taken into account the conditions of the local market at the time, including any factors that slowed the market. Finally, the dissent contends that a jury could infer that the property was "essentially worthless" because "the property had sold a year earlier for about $2 million, and that about $2.2 million in debt was attached to it...." This argument, however, conveniently overlooks the

cause the government has failed to provide sufficient evidence that the object of the conspiracy was illegal, we reverse Beuttenmuller's conviction for conspiracy.

## B

■ Gill argues that there is insufficient evidence to support his convictions on one count of aiding and abetting[18] bank fraud in violation of 18 U.S.C. § 1344,[19] and two counts of aiding and abetting misapplication of funds in violation of 18 U.S.C. § 657[20]—all counts relating to the same underlying transaction discussed above.[21] Specifically, Gill contends that the government failed to prove that he had the requisite intent, and—given that we have held that the government failed to prove that the Tanglewood–Mansfield transaction was illegal—we agree. To convict a defendant of aiding and abetting, the government must prove that the defendant intentionally associated with a criminal venture, participated in the venture, and sought by his actions to make the venture succeed. *United States v. Murray*, 988 F.2d 518, 522 (5th Cir.1993); *United States v. Parekh*, 926 F.2d 402, 406 (5th Cir.1991); *see also* 18 U.S.C. § 2 (1969).

■ Under the government's theory of this case, the conviction for aiding and abetting the misapplication of funds and defrauding the bank rides or falls on whether Shamrock's purchase of an interest in the Mansfield property was a sham. Because we have already held that the government failed to prove beyond a reasonable doubt that the Mansfield/Tanglewood transaction was less than a value-for-value transaction, Gill's intent cannot be inferred from the circumstances surrounding the transaction. Thus, there being no underlying criminal venture involved here, we reverse Gill's conviction on each count.

## C

■ Finally, Beuttenmuller contends that the evidence presented by the government is insufficient to support his conviction for aiding and abetting the making of a false entry in the records of a financial institution. 18 U.S.C. § 2(b) (1969); 18 U.S.C. § 1006 (Supp.1993). To prove that Beuttenmuller is guilty of aiding and abetting in violation of 18 U.S.C. § 2(b),[22] the government must demonstrate beyond a reasonable doubt 1) that

rezoning that occurred since the property was sold for $2 million. The undisputed evidence in this record demonstrates that after the rezoning, the property had an appraised value of at least $4 million.

Given the dissent's attacks on the value of the property, we feel it necessary to point out that the Mansfield property had an appraised value of $4 million in April 1989, some three years after the transaction in question. It is true that this appraisal was not part of the record at trial, but was only introduced at sentencing. Nevertheless, the fact that the property was appraised at $4 million three years later in a declining real estate market verifies the record evidence concerning the value of the Mansfield transaction. We think that it verifies our conclusion, based only on the record evidence, that no juror could conclude beyond a reasonable doubt that the transaction in question was a cash for trash transaction.

18. *See supra* note 21.

19. Section 1344 states that

[w]hoever knowingly executes, or attempts to execute, a scheme or artifice ... to defraud a financial institution; or ... to obtain any of the moneys, funds, credits ... or other property owned by, or under the custody or control of, a financial institution, by means of false or

fraudulent pretenses, representations, or promises shall be [guilty of an offense against the United States.]

18 U.S.C. § 1344 (Supp.1993).

20. Section 657 states in pertinent part that

[any person] connected in any capacity with ... [a] savings and loan corporation or association ... authorized or acting under the laws of the United States or any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ... [who] willfully misapplies any moneys, funds, [or] credits ... belonging to such institution [shall be guilty of an offense against the United States.]

18 U.S.C. § 657 (Supp.1993).

21. The jury convicted Gill of two counts of aiding and abetting bank fraud and two counts of aiding and abetting misapplication of funds. At sentencing, one count of aiding and abetting bank fraud was dismissed as multiplicious.

22. Title 18 U.S.C. § 2(b) states that "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

Beuttenmuller willfully associated himself with a criminal venture, and willfully participated in it, as if it were something that he wished to bring about; and 2) that each element of the offense that Beuttenmuller is accused of aiding and abetting was committed by some other person. *United States v. Parekh*, 926 F.2d at 407 (holding that the government must prove that "the defendant associated with a criminal venture, participated in the venture, and sought by his action to make the venture succeed."); *see also United States v. Murray*, 988 F.2d at 522.

■ In this case, the "criminal venture" of which Beuttenmuller has been convicted is aiding and abetting Jack Lane in making a false entry in bank documents in violation of § 1006.[23] Specifically, the government contends that designating the $50,000 cash payment to Richard Billings as a commission on the Tanglewood property transaction rather than as payment for Billings' equity was a false entry violation of § 1006. To prove a violation of § 1006, the government must show beyond a reasonable doubt 1) that Shamrock Savings was a lending institution authorized and acting under the laws of the United States; 2) that Lane was an officer, agent, or employee of the bank; 3) that Lane knowingly and willfully made, or caused to be made, a false entry concerning a *material fact* in a book, report, or statement of the bank; and 4) that Lane acted with intent to injure or defraud the bank or any of its officers, auditors, examiners, or agents. *United States v. Tullos*, 868 F.2d at 693–94 (emphasis added); *United States v. Stovall*, 825 F.2d 817, 823 (5th Cir.1987). Although we were unable to find cases defining what constitutes a "material fact" with respect to 18 U.S.C. § 1006, cases construing a similar statute, 18 U.S.C. § 1001, have defined the term as "hav[ing] a natural tendency to influence, or be[ing] capable of affecting or influencing, a government function." *United*

*States v. Swaim*, 757 F.2d 1530, 1534 (5th Cir.1985), *cert. denied*, 474 U.S. 825, 106 S.Ct. 81, 88 L.Ed.2d 66 (1985). Put differently, "[t]he concealment 'must simply have the capacity to impair or pervert the functioning of a government agency." *Id.* (quoting *United States v. Lichenstein*, 610 F.2d 1272, 1278 (5th Cir.), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980)); *United States v. Beer*, 518 F.2d 168, 170 (5th Cir.1975). While materiality rests upon a factual evidentiary showing by the prosecution, the actual determination of materiality is a question of law for the court, and as such, it is reviewed *de novo*. *United States v. Lichenstein*, 610 F.2d at 1278.

■ In this case, the government provided sufficient evidence at trial to demonstrate that Shamrock Savings was a lending institution authorized and acting under the laws of the United States, and that Lane was an officer of the bank. The government also offered proof sufficient to show that characterizing the equity payment as a "commission" was false. Beuttenmuller contends, however, that there is insufficient evidence to demonstrate that Lane made, or caused to be made, a false entry concerning a *material fact*. The government, on the other hand, argues that there is sufficient evidence in the record to demonstrate that designating the equity payment a "commission" concealed the material fact that the sale of the Tanglewood and Mansfield properties were related.

We find Beuttenmuller's argument persuasive. The simple fact is that the government provided no evidence or rationale to demonstrate that the false characterization concealed a material fact. No banking regulator—or any other witness for that matter—testified how this false entry would adversely affect the function of a governmental agency. No evidence was presented to demonstrate that a regulator would have probed any further or done anything different if the $50,000

---

**23.** As it appeared in the jury instructions, 18 U.S.C. § 1006 states:

[A]ny officer, agent or employee of ... a savings and loan association ... authorized or acting under the laws of the United States or any institution, the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ... [who] with intent to de-

fraud ... [that institution] or to deceive any officer, auditor, examiner or agent of that institution or to deceive a department of agency of the United States ... makes any false entry in any book, report or statement of or to [that] institution ... [shall be guilty of an offense against the United States].

18 U.S.C. § 1006 (Supp.1993).

payment to Billings had been labeled an equity payment instead of a commission; no evidence or rationale was presented to show that designating the payment an equity payment would have led to the discovery of the connection between the sales of the Mansfield and Tanglewood property. Although it may be atypical for a buyer to receive an equity payment, as far as this record shows, it is equally atypical for a buyer to receive a commission on the sale of property it purchases. The effect of either designation, equity or commission, on any governmental agency function is simply unknown to us—as it was to the jury—because the government failed to provide relevant testimony or rationale to shed light on this question. *But cf. United States v. Swaim*, 757 F.2d at 1535 (noting that testimony of bank official established the materiality of the concealed fact). Without such evidence, the jury could not conclude beyond a reasonable doubt that designating an equity payment a commission was a false entry concerning a material fact. Thus, we reverse Beuttenmuller's conviction on this count.

## IV

Throughout this case, the government has, rather vehemently, argued that this complex real estate transaction was fraught with illegal conduct. Notwithstanding the government's polemics, the simple facts are these: Shamrock Savings had the right to dispose of its REO; it had a right to locate and to negotiate with willing purchasers; it had the right to lend the purchaser of REO eighty percent of the purchase price; Gill and Billings had the right to purchase the REO with the proceeds from the sale of the Mansfield property; and, generally, these parties had the right to deal with one another and construct a complex conditional real estate sales transaction that benefitted each party. The only thing these parties had no right to do was violate any statute, regulation, or law in the process. The government has failed to prove beyond a reasonable doubt, however, that these parties violated any statute, regulation, or law.

There is nothing unusual about people, who can economically benefit each other, getting together and constructing a mutually beneficial bargain. Moreover, no criminality can be attached to Beuttenmuller, Gill, Billings, or Shamrock Savings because the bottom dropped out of the real estate markets. The decline of any market is part and parcel of the risks of investing. Based upon the reasons given in this opinion, the convictions of Rudolph W. Beuttenmuller and Larry R. Gill are

REVERSED.

RHESA HAWKINS BARKSDALE,
Circuit Judge, dissenting:

In yet another sad chapter in the saga concerning the misuse and abuse—some might justifiably say looting—of the savings and loan industry in Texas in the 1980's, we are faced principally with a straightforward, easy-to-resolve issue springing from a jury's guilty verdicts. We are not required to resolve, for example, whether the jury was instructed correctly on the various intertwined charges; no one claims it was not. Instead, the primary issue before us is a simple one, insofar as legal principles and our standard of review are concerned: sufficiency of the evidence.[1] The majority describes correctly our deferential standard of review for such a challenge: a jury's guilty verdict must be sustained if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (citation omitted; emphasis in original).

This standard is grounded in the common sense, legally—indeed, constitutionally—blessed idea that jurors who heard the testimony, examined the documentary evidence, judged the credibility of the witnesses, and participated in the other events that comprise a criminal jury trial are to be accorded great deference in their verdict. For this reason, "[i]t is not necessary that the evi-

---

1. Gill and Beuttenmuller raise other issues, which the majority does not reach, because it reverses on the sufficiency challenge. None justifies reversal.

dence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt". *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. 1982) (en banc), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). "Juries are free to use their common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence." *United States v. Heath,* 970 F.2d 1397, 1402 (5th Cir.1992) (citations omitted), *cert. denied,* —— U.S. ——, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993). Accordingly, "[a]ll reasonable inferences from the evidence must be construed in favor of the jury verdict." *United States v. Martinez,* 975 F.2d 159, 161 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1346, 122 L.Ed.2d 728 (1993) (citation omitted). In sum, "[t]his standard [of review] is a strict one and a jury verdict will not be overturned lightly." *United States v. Frayer,* 9 F.3d 1367, 1371 (8th Cir.1993) (citation omitted).

It is well to remember that whether criminal intent exists is a classic jury question. *E.g., United States v. Toro,* 840 F.2d 1221, 1231 (5th Cir.1988) ("Whether the defendant had the criminal intent required for conviction is a jury issue....") On appeal, we have only the cold record and briefs before us. Obviously, appellate review serves a critical function in the criminal justice process. But, we sit primarily to correct errors of law. When we begin sifting through the facts, taking over the jury's function, we begin generally to tread on thin ice. This is especially true for a case such as this, where the scheme at issue would be carefully and skillfully concealed in order to extricate Shamrock Savings from its "rapidly deteriorating" situation resulting from foreclosing on property (Tanglewood) "secur[ing] a loan accounting for more than seventy percent of [its] total capital". Maj. Op. at 975.

It is for this reason that the sufficiency standard presents such a high hurdle—one that neither Beuttenmuller nor Gill has cleared. Only by improperly substituting itself for the jury can the majority reach the conclusion that it does. Accordingly, I respectfully dissent.

I.

I principally part company with the majority's view that the Tanglewood/Mansfield exchange was "value for value". The evidence was more than sufficient for the jury to conclude otherwise, which it did. The majority aptly describes the separate crises facing Shamrock (original Tanglewood owner) on the one hand, and Gill and Billings (original Mansfield owner) on the other:

Following foreclosure, the Tanglewood property was accounted for as "real estate owned," or "REO," on the balance sheet of Shamrock Savings. Not surprisingly, such a large amount of REO caused an accounting problem for Shamrock Savings. If the Tanglewood property remained classified as REO at the end of the fiscal year, which would close on September 30, Shamrock Savings would be required to create on its balance sheet a substantial reserve against capital. Consequently, Shamrock Savings began looking for a buyer for the Tanglewood property in order to reduce the value of the REO account....

Meanwhile, two investors previously unconnected with Shamrock Savings, Larry Gill and Richard Billings, were experiencing their own financial difficulties. Gill and Billings were investors who formed a joint venture, known as the Mansfield 150 Joint Venture, to manage and develop approximately 155 acres of vacant agricultural land in Mansfield, Texas.... The Mansfield property was encumbered by several deeds of trust, securing in excess of $2,220,000 in mortgage and related debt. Gill and Billings were personally liable for a substantial portion of this debt, and, because the property itself generated no income, Gill and Billings were required to make interest and principal payments from personal resources.

During the summer of 1986, Gill and Billings were seeking an investor or lender to relieve them of the Mansfield property's crushing debt....

Maj. Op. at 975 (footnote omitted). What the majority should also note is that Gill's and

Billings' search for "an investor or lender" was a desperate one.

## A.

As for Beuttenmuller's conviction for conspiracy to commit an offense or defraud the United States, in violation of 18 U.S.C. § 371, the majority states accurately that the transaction at issue was " 'backed into' to provide sufficient cash to complete the sale of the Tanglewood property." Maj. Op. at 976 n. 4. In other words, it was structured so that at the end of the day, a 20 percent down payment ($555,000) could be shown as having been made on the Tanglewood property. The majority notes the critical point: a 20 percent down payment was "*necessary* to allow Shamrock Savings to record a sale of the Tanglewood property." *Id.* at 976 n. 4 (emphasis added).

Indeed it was. While Shamrock would be free to remove non-income producing REO from its books through a sale and financing, it could not be deemed to have "sold" the REO absent the 20 percent down payment. Savings and loans were obligated to prepare "financial statements and reports . . . on the basis of generally accepted accounting principles" for federal regulators. *See* 12 C.F.R. § 563.23–3 (1986). And, Kirk Tennant, a lecturer in accounting at Southern Methodist University, testified that such principles would determine whether REO was actually sold. More specifically, he testified that the Financial Accounting Standards Board Statement No. 66 (which he characterized as a generally accepted accounting principle applicable to savings and loans) controlled. According to Tennant, that statement, which

"was promulgated . . . to [e]nsure that entities do not record excess profits on the sale of real estate", requires that a 20 to 25 percent down payment be made on property like Tanglewood to qualify as a valid sale.

Along that line, Shamrock's former chief financial officer, one of Gill's witnesses, testified that Shamrock had to have the 20 percent down payment in order to show a sale of the REO and thus book a profit. Likewise, Lane testified that a $555,000 down payment had to be made by the end of the fiscal year (September 30, 1986, the date of the closings on the transactions) to allow the accountants to remove Tanglewood from REO. Finally, one · of Beuttenmuller's witnesses testified that independent auditors would not allow a "cash-for-trash" transaction to be reported as a profit on a savings and loan's books if they were aware of the true nature of the transaction.

The evidence is sufficient for a rational jury to find that the entire transaction was structured so that Shamrock could send its cash out to be "lightly laundered" through Billings and Gill, and then returned to Shamrock as the requisite down payment on the Tanglewood REO.[2] Given that the transaction was "backed into", so that $555,000 could leave Shamrock's wholly-owned subsidiary and return to Shamrock under the guise of a "down payment" by the new joint venture, a jury could also reasonably find that Billings and Gill were "straw men", funnelling Shamrock's own cash into a down payment on its own REO.

A number of facts support these findings. Billings testified (pursuant to a grant of im-

---

**2.** Courts are not unfamiliar with similar schemes to use savings and loan funds as down payment on REO. *See, e.g., United States v. Best,* 939 F.2d 425 (7th Cir.1991) (en banc), *cert. denied,* —— U.S. ——, 112 S.Ct. 1243, 117 L.Ed.2d 476 (1992). In *Best,* which the majority cites, *see* Maj. Op. at 979, the court described one such scheme:

In addition to several other practices that violated the norms of the savings and loan industry, [the institution's officers] would require borrowers to purchase REO from [the institution] and its subsidiaries as a condition of obtaining a loan. In so doing, [the officers] attempted to disguise [the institution's] deteriorating financial status. They would apply as

much of the loan as was necessary to cover the down payment for the purchase of the real estate. By this tactic, [the officers], in effect, were selling [the institution's] real estate to the borrower—who typically was not creditworthy and known by [the officers] to be so—for no cash down.

*Id.* at 426 (citation omitted). Much the same thing happened here, only rather than funnelling the money out via a "loan" subject to different collateral, Shamrock did so via an "investment" by one of its subsidiaries in Mansfield. *See also United States v. Best,* 913 F.2d 1179, 1180–81 (7th Cir.1990) (employing phrase "lightly laundered"), *vacated on rehearing,* 939 F.2d 425 (7th Cir.1991) (en banc).

munity by the government) that he and Gill had *no* interest in buying Tanglewood; indeed, they had *no* financial resources whatsoever.[3] Billings described the *quid pro quo* of the transaction: "[f]or them [Shamrock] to buy into our partnership we had [to] buy [Tanglewood]." And, so far as Lane was concerned, he didn't "think they [Billings and Gill] made a down payment", a thought consistent with the notion that Billings and Gill were merely conduits (or the laundry) for Shamrock funds. Indeed, Lane stated that the *entire* purpose of the transaction "was to sell REO", and that the figures arrived at for the transaction were driven by the need to secure the 20 percent down payment on Tanglewood. In other words, the transaction bore no relationship to market prices, which is the conclusion also reached by expert witness Tennant. Gill testified that the *total* amount he received for the Mansfield Joint Venture was $50,000 less expenses; obviously, Gill did not view the $555,000 that moved in a circle as having ever been his profit on the Mansfield sale. Likewise, Billings stated that he understood that he was getting $50,000 for the Mansfield property.

The primary purpose of the transaction is highlighted by the curious maneuvering regarding Franks' fee and where Billings' so-called "equity payment" would come from. At the last minute, as the majority notes, Franks insisted that his fee be increased from $50,000 to $100,000. (The record does not reveal why Franks was able to demand, and receive, a 100 percent increase in his finder's fee; of course, the jury might well have drawn a reasonable inference concerning Franks' awareness of the fundamental purpose of the transaction—as well as the awareness of the parties who allowed him what he demanded.[4]) If the additional $50,000 were deducted from the Mansfield side of the transaction, from which Franks was already set to receive the original $50,000, and assuming the equity payments were still disbursed as planned to Billings and Gill ($50,000 each), there would not have been enough cash to make the requisite 20 percent down payment. So, Beuttenmuller suggested that Billings get his money as a "commission" on the sale of the Tanglewood property. In this manner, the $50,000 was paid out of the proceeds of the "down payment" made to Shamrock.[5]

The majority emphasizes the appraised value of the Mansfield property as justification for the exchange being "value-for-value". In fact, the majority states that "[t]he *only evidence* in this record concerning the dollar value of the Mansfield property demonstrates that, at the time of the transaction, the property had an appraised value of at least $4 million." Maj. Op. at 980 (emphasis in original); *see also id.* at 976 n. 5; 980 n. 17. But, the proof cast doubt on this statement.

The majority derives its figure from the testimony of Kelly Miller, who did the Mansfield appraisal in 1986. Apparently, the majority has taken his appraisal—slightly over

3. The Mansfield property was totally leveraged. Billings and Gill had purchased the original 150 acres in June 1985 for approximately $1.9 million. Approximately $1.5 million of that purchase price was financed by the seller through a non-recourse note. The remainder (approximately $400,000) was financed through a bank loan. And, when the first interest payment to the seller came due in early 1986, Billings and Gill obtained another bank loan for $200,000 to cover it.

4. As the majority notes, Franks was known as "Mr. Fix–It"; he testified at trial pursuant to a plea agreement in which he had pleaded guilty to charges of unlawful participation in a transaction involving a financial institution. Maj. Op. at 975 n. 3. In late 1986 or early 1987, Franks had also pleaded guilty to two counts of mail fraud and one count of wire fraud. Franks recalled that, at the time of the Tanglewood/Mansfield transaction, it was a matter of public information that he was the subject of a federal investigation. And, although he could not specifically recall if he had mentioned this to the Tanglewood/Mansfield parties, he did state that he was "letting anyone that I was in business with" know of the federal investigation.

5. Billings did nothing to facilitate the sale of the Tanglewood property. In fact, he had never seen it, did not know how much (if any) income it was producing, did nothing to try to sell it, and had no brokerage agreement with Shamrock. In addition, Billings also played virtually no role in attempting to sell or find an investor for the Mansfield property. He testified that he "basically just dumped it in [Gill's] lap and said, whatever you can negotiate on our best interests I probably will go along with."

$7 million—and reduced that amount by one of Miller's estimates regarding how much investment was needed to fully develop the property (an assumption of his appraisal). *See* Maj. Op. at 976 n. 5. From this, the majority states that "[b]ecause we must view the evidence in the light most favorable to the prosecution, we will assume that the property had a net appraised value of $4 million." Maj. Op. 976 n. 5.

But, the record demonstrates the generousness of the majority's assumption:

BY [Beuttenmuller's lawyer]:

Q. And you said it would take as such 2,000,000 to get it to that [$7,123,000] level?

A. As I said, that's a guess.

Q. I understand that's a guess.

A. *I have no calculation for that. We weren't supplied any engineering cost.*

Q. Could take a million?

A. Could take that. I'm almost sure it would take almost that.

Q. Somewhere between a million and 2,000,000?

A. I would say depends on how it's developed finally and at what stage it's being sold.

&ast; &ast; &ast; &ast; &ast; &ast;

BY [DOJ lawyer]:

Q: Mr. Miller, with respect to how much it would take to develop it, you testified it could take a million. Could it as easily take $3,000,000?

A. *I'm having to guess. I'm sorry. It could take three.*

Q. Sir? It could?

A. *I have no way of knowing that without running that kind of a calculation.*

(Emphasis added). (This appraised value did not consider the $2.2 million in debt attached to the property.)

The jury may have decided, again most reasonably, that Miller's appraisal was more than speculative. As discussed, his appraisal assumed that the property was fully developed as a residential subdivision, and that demand for the fully-developed Mansfield property—two years out—would be comparable to that of other residential subdivisions, *i.e.,* "comparables" (in 1986). This assumed a great deal, to say the least. As Miller testified, the Mansfield property was nothing more than a "hay field". It had no curbs, gutters, water lines, or sewer lines. And, as was made clear earlier, Miller had no real idea what it would cost to develop (or market) the property.[6] (In addition, although not expressly elicited before the jury, Miller did not reduce his appraisal to a present value.)[7]

In the face of this speculative appraisal, the jury had other, solid evidence from which it could value the Mansfield property—evidence the majority apparently rejects in favor of its reading of Miller's appraisal. As noted, Billings and Gill had paid only approximately $2 million for the property about a year before the transaction. Keeping in mind the tried and true maxim that property is worth only what a buyer is willing to pay for it, the jury could infer that the property was worth significantly less than the appraised value.[8] As noted, Billings and Gill

6. The majority disagrees with my position that the jury could decide that the appraisal was ridiculously speculative, stating: "Although there was some question concerning the appraised value at trial, no evidence was introduced that could reasonably lead a jury to conclude that the appraisal was so flawed or otherwise invalid that the jury could ignore it altogether." Maj. Op. at 980 n. 17. As discussed, Miller had no clue what it would cost to develop the property (from an engineering standpoint, much less from a marketing one); he variously assented to suggestions of $1 million, $2 million, and $3 million, but concluded that he had "no way of knowing" the development cost.

7. One of Beuttenmuller's own witnesses *testified* that a cash-for-trash deal may "involve an appraisal that has a very optimistic view of value of that land"; thus, it is unsurprising that the appraisal assumed full development of the acreage and neglected to discount the possible future revenues from the fully-developed site to present value. Although the majority opines that "[t]here has been no suggestion at trial" that the appraisal was not an arm's length, "professional assessment of the property", Maj. Op. at 976 n. 5, there was a very real suggestion at trial that the appraisal was greatly exaggerated.

8. The majority notes that the jury cannot "rely on maxims as evidence." Maj. Op. at 980 n. 17.

were desperately "seeking an investor or lender to relieve them of the Mansfield property's crushing debt." Maj. Op. at 975. Actually, Billings and Gill were quite anxious to find a *purchaser* for the property; they had put together marketing materials and contacted some 50 people in the real estate business in an effort to sell Mansfield. But, they "didn't have any buyers"; and, in assessing the marketability of Mansfield, Billings testified that it was negligible, explaining that "the real estate market had definitely gone in the toilet." [9] They were seeking an investor or partner only because of the absence of parties interested in an outright purchase of Mansfield.

In addition to the evidence discussed above, expert witness Tennant testified that the transaction was circular and would not occur in the normal course of business. He stated that the transaction was not the product of a situation in which "the agreed upon prices ... would have come about through the market mechanisms...." When asked, he stated that the appraisals did not alter this opinion. And, he gave the jury information suggesting that a genuine sale was the only means of actually ascertaining the value of property (even if a jury must be told this).

Put bluntly, as Billings did at trial, the $753,000 figure "had no relationship whatever" to the value of the Mansfield property.

Considering that the property had sold a year earlier for about $2 million, and that about $2.2 million in debt was attached to it, and further considering that the real estate market had "gone in the toilet" since the $2 million sale (and, as a consequence, Billings and Gill could not find a purchaser), a reasonable jury could infer, quite easily, that the property was essentially worthless.[10] In sum, the jury could well infer that the alleged "purchase" price of Mansfield was suspicious by itself, even setting aside the ample, direct evidence that the "purchase" was "backed into".

Nevertheless, it is well to remember that Shamrock gave Billings and Gill relatively little more than $550,000 *on the condition* that they immediately give $550,000 back as a "down payment". They simply had no choice; to get some relief from their desperate condition relating to Mansfield, they had to take money from Shamrock's left pocket, and return it to its right.[11]

In addition to relying on the speculative 1986 appraisal to justify its conclusion, the

---

But, as is discussed later, an expert witness suggested to the jury that a property's value can be truly ascertained only upon a sale.

9. Billings also noted that, since the original purchase of the Mansfield property, "the real estate market had gone sour". Later, he stated that, as Gill desperately searched for a purchaser or investor, the "[r]eal estate market was the worst it had been", and that "[t]here were no other buyers out there."

10. The majority states that I "conveniently overlook[ ] the rezoning that occurred since the property was sold for $2 million. The undisputed evidence in this record demonstrates that after the rezoning, the property had an appraised value of at least $4 million." Maj. Op. at 980 n. 17. The majority makes it appear that there was a sudden increase in the property's value on rezoning, but there is no evidence in the record that the rezoning was anything more than a mere formality, and thus no evidence that the original purchase price did not already reflect Mansfield's value for commercial exploitation. In fact, the record contains evidence that the parties assumed that the rezoning would be no problem; indeed, the broker who approached Billings with

the original 150 acre Mansfield tract "indicated it [rezoning] could be done." Billings then approached Gill with an eye toward determining whether this was so. Thus, all the parties assumed the property's utility for development when the property sold for around $2 million; it is a dubious claim that the property's value increased materially—indeed, doubled—as a consequence of the rezoning. (Even the majority notes that Billings and Gill purchased the property to "develop" it. Maj. Op. at 975. If there were to be rezoning problems—a proposition unsupported by the record—then Billings and Gill's purchase would have been worse than unlucky; it would have been plain stupid.) Even if some nominal increase in value occurred as a consequence of rezoning, there is no way of knowing whether that increase offset the corresponding, intervening collapse of the real estate market (as discussed *supra*). Accordingly, a jury would not be irrational to conclude that the property was worth about $2 million—without considering the attached $2.2 million in debt.

11. At least they were able to get the "financing" of Tanglewood to include a non-recourse provision; after all, there are some things that even straw men (or your laundry) should not have to do.

majority refers to a $4 million appraisal of Mansfield in 1989. It opines that although

> this appraisal *was not part of the record at trial,* ... the fact that the property was appraised at $4 million three years later *in a declining real estate market* verifies the record evidence concerning the value of the Mansfield transaction. We think that it verifies our conclusion, based only on the record evidence, that no juror could conclude beyond a reasonable doubt that the transaction in question was a cash for trash transaction.

Maj. Op. at 980 n. 17 (emphasis added).[12]

In utilizing evidence not presented to the jury to "verify" its reversal of a jury's verdict for insufficient evidence, the majority accomplishes several things, not least of which is totally discarding our limited scope of review for a jury verdict. I am aware of no case that has utilized evidence outside of the record to reverse convictions for insufficiency of the evidence—or, as the majority puts it, to "verify" its reversal. Apparently, it does not trouble the majority that this appraisal was not rigorously tested in the guilt-innocence phase of the trial (where, for example, cross-examination regarding the appraisal might have occurred). The reference also illustrates that the majority is uncomfortable with the support from the record it has mustered to deem the jury's verdict irrational; no more telling indication of the majority's uncertainty can be imagined than its recourse to an appraisal made years after the transaction and not disclosed to the jury.

Moreover, there is no evidence to support the majority's assertion that the real estate market was "declining" between September 1986 (the date of the transaction) and 1989. The only evidence of a declining real estate market relates to the market's movement between the $2 million purchase and the transaction in issue.[13]

What the majority fails to accomplish in this unprecedented reference is what it no doubt sought, namely, support for its position. According to the majority, Shamrock Land invested $1.4 million in the property after its acquisition and before October 1988. Maj. Op. at 978. Any such investment that raised the value of the property would have to be subtracted from the appraisal to even begin to figure out what the property was worth three years earlier, prior to such investment. Also, the secured debt in 1986, $2.2 million, must be considered. Furthermore, one must discount the 1989 value to a 1986 *present value* (to have ownership of property in 1986 that will be worth $4 million in 1989 dollars is not to own property worth $4 million in 1986 dollars; inflation of the currency and opportunity costs associated with the time-value of money, *i.e.,* interest, must be considered). All told, the appraisal does not support the majority's position.

Overall, the transaction comports precisely with one of Beuttenmuller's own witness' definition of a "cash-for-trash" deal: "giving somebody some money to buy something that you want to get rid of real bad."[14] Obvious-

---

12. Presumably, the "1989" appraisal to which the majority refers was an August 1988 appraisal of $4 million. Although this appraisal apparently was never introduced—at trial or sentencing—it was referred to in an affidavit introduced at sentencing. That affidavit, in turn, referred to an April 1989 memorandum concerning Mansfield, which "reiterated" the $4 million value. To be consistent with the majority and avoid confusion, we will also refer to the $4 million figure as a 1989 appraisal.

13. Taking a page from the majority's book, one of the defendants' witnesses at sentencing testified that "there wasn't" any devaluation of the property between September 1986 and 1989. Furthermore, an appraisal prepared in May 1990, which was admitted at sentencing, contained a market value of only $2,180,000 for Mansfield (and estimated its fair value if a sale

were conducted within 12 months as $1,300,-000).

14. Franks, a.k.a. "Mr. Fix–It", provided a more detailed explanation of the term in the following colloquy with the prosecutor:

> Q. In the real estate industry what term is commonly used to describe these kinds of transactions?
> A. *The term cash-for-trash is used frequently and was used then.*
> Q. Could you explain the term cash-for-trash?
> A. The term cash-for-trash, as I understand it, means that a lender, savings and loan, bank, insurance company, whatever, would furnish financing for either the acquisition or refinancing of a person's property provided that a portion, if not all, of those funds were utilized in the acquisition of a problem loan or an REO on the books of that lender.

ly, it was not permissible for a savings and loan to *give* cash to somebody to be used as a down payment on the purchase of its REO. And, the fact that other "value-for-value" transactions might have taken place (whether independent of the scheme, designed to compensate the straw men for their complicity, or done to cover-up the underlying transaction) is of no moment.[15] A jury evaluating the evidence could conclude that the intent of the parties to the exchange was, at bottom, to allow Shamrock to remove REO by furnishing its own cash for the down payment; something it could not do.[16]

From the evidence adduced at trial, the majority simply draws different inferences than did the jury. But, we cannot substitute our inferences for the jurors', unless those inferences were irrational. That, I respectfully submit, was not the case here; far from it.

## B.

As for Beuttenmuller's conviction for aiding and abetting the making of a false entry in the records of a financial institution, in violation of 18 U.S.C. §§ 2(b), 1006, the evidence was sufficient to support the verdict. The majority disposes of this claim because it finds nothing *materially* misleading about the representation in the Tanglewood binder that the $50,000 payment to Billings was a "commission" for his efforts in selling Tanglewood, rather than the earlier agreed "equity payment" on the Mansfield property. Maj. Op. at 982–83. Again, I respectfully disagree.

When deciding whether a false statement is material, inquiry into the context in which

the false statement is made may prove useful. *Cf. United States v. Williams,* 12 F.3d 452, 456 (5th Cir.1994) (in assessing materiality of false statements under 18 U.S.C. § 1014, "the statements must be analyzed in the particular context in which they were made") (footnote with citation omitted). Given Franks' last-minute demand for an additional $50,000, and Shamrock's desire to avoid bringing "additional cash to the closing table", *see* Maj. Op. at 977, Shamrock, as discussed *supra*, could not pay Billings from the Mansfield side of the transaction and still have sufficient cash to make the requisite down payment on Tanglewood, the raison d'etre for the exchange. Thus, "Beuttenmuller suggested that Billings receive the $50,-000 ... as a real estate commission on the Tanglewood property" to be paid by Shamrock Savings sometime after the closing of both transactions. Maj. Op. at 977. Now, the $50,000 equity payment had to be made out of the Tanglewood transaction, and thus accounted for on *its* disbursement schedule. It was in this context that the false entry of Billing's equity payment as a "commission" on the sale of Tanglewood was made. And, this false entry in the Tanglewood schedule had the capacity to mislead, and hence was material, because an accurate entry in the Tanglewood binder's disbursement schedule of the payment as an equity payment for the Mansfield property might have alerted bank examiners to the existence of a tied transaction—thus exposing the "cash-for-trash" deal.

Without such a truthful entry, the Tanglewood binder contained no reference to the Mansfield transaction; it omits to refer to the other half of what was allegedly a "single

---

Q. And in this transaction what was the cash going to be?
A. The cash would be a portion of the funds that were generated from the service corporation of Jerry Lane's savings and loan[']s[] acquisition of the Gill property. A portion of that cash would be used to fund the acquisition of the REO.
Q. What was the trash?
A. Trash would be referred to as the Austin property [Tanglewood].
(Emphasis added.)

**15.** A jury could find that there might have been some value-for-value component to the exchange.

Put differently, *perhaps* a jury could infer that a 45 percent stake in Mansfield was worth $100,-000 (the agreed equity payments for Billings and Gill). But, this falls far short of accounting for the $550,000 that moved in a circle; and a jury could rationally conclude that the $550,000 was not part of any value-for-value exchange.

**16.** I also note that ample evidence existed to prove that Beuttenmuller knew about the 20 percent requirement, and understood why the deal was being "papered" by him in the manner that it was.

integrated exchange transaction". Bank examiners would have examined the Tanglewood binder; a former Shamrock corporate secretary and director testified as to what they might discover:

Q. Can you tell us what hints there are in the binder that at the same time this loan and sale took place a Shamrock affiliate made a $730,000 payment to Mr. Gill and Mr. Billings?

A. From the table of contents there is no indication.

Q. And with respect to this same document can you tell us what indications there are that the down payment on the sale of the Tanglewood property came from a Shamrock affiliate?

A. From this file nothing.

The jury could reasonably find that, had the Tanglewood binder instead reflected an "equity payment" of $50,000 to Billings on the Mansfield property, a regulator might have been alerted that another transaction was related to it. In this sense, the jury could reasonably conclude that the entry of the payment as a "commission" might have had a tendency to influence a government function by helping conceal from a bank examiner the existence of a tied transaction. And, by the majority's own reckoning, this is all the government must prove. Maj. Op. at 982.

The majority neither denies the falsity of characterizing the equity payment to Billings on the Mansfield property as a brokerage commission on the sale of Tanglewood nor disputes the underlying facts. Rather, the majority opines that a bank examiner—or, perhaps, some other witness—was required to testify that the false entry "would adversely affect the function of a governmental agency", or present evidence that "a regulator would have probed ... further or done [something] different if the ... payment ... had been labeled an equity payment". Maj. Op. at 982–83.

The majority is correct that a bank regulator did not testify that the entry did or would affect a governmental agency's function. Of course, a "misrepresentation need not have influenced the actions of the government agency, and the government agents need not have actually been deceived."

*United States v. Swaim,* 757 F.2d 1530, 1534 (5th Cir.) (*quoting and citing United States v. Markham,* 537 F.2d 187, 196 (5th Cir.1976) *cert. denied,* 429 U.S. 1041, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977)) (both discussing 18 U.S.C. § 1001), *cert. denied,* 474 U.S. 825, 106 S.Ct. 81, 88 L.Ed.2d 66 (1985). To be material, a false statement "must simply have the capacity to impair or pervert the functioning of a government agency." *Cf. Swaim,* 757 F.2d at 1534 (footnote and internal quotations omitted; discussing § 1001).

Surely, the false statement in issue had the capacity to impair government bank regulators. As discussed, the Tanglewood binder would have been examined by such regulators. Moreover, as the testimony of the former Shamrock corporate secretary and director makes clear, nothing in the Tanglewood binder would alert an examiner that there was a tied transaction, *i.e.,* Mansfield. If the false entry were not in the Tanglewood binder, and a truthful entry were made, *i.e.,* "$50,000 to Rich Billings as equity payment for Mansfield property", such an entry would—at the least—have a tendency to arouse an examiner's suspicions.

In fact, Beuttenmuller's own witnesses offered additional evidence supporting this. A former deputy savings and loan commissioner for Texas, who was called to state that he would not have a problem with characterizing the payment as a "commission", admitted that if that characterization was designed to obscure a cash-for-trash deal, he would have a problem with it. Under cross-examination, he gave the following testimony when a hypothetical offered by Beuttenmuller was altered by the prosecutor:

A. Are you saying that hypothetically Mr. Billings had participated in a cash-for-trash transaction at Shamrock Savings?

\* \* \* \* \* \*

Q. Yes, sir.

A. That I'm to factor that into the situation?

Q. Yes, sir. And that he's gotten the $50,000 as consideration for the cash-for-trash deal. Follow that?

A. No.

Q. Okay. The commission that is in [Beuttenmuller's] hypothetical that you opined on was payment—part of his payment for doing the cash-for-trash deal. Follow that?

A. (Witness nods head.)

Q. *And that payment doesn't say anything about the other deal. It says it's a commission just like any other commission paid to a broker. It's not disclosed. Does that change your opinion, sir?*

A. If you're telling me that the commission was not really a commission, then I guess we would have to go back and look at what was it really for.

Q. But it gives you a problem, doesn't it?

A. It does.

(Emphasis added.)

Likewise, another of Beuttenmuller's witnesses, a former member of the Texas finance commission, which was responsible for overseeing thrifts, emphasized the importance of full disclosure in closing documents. On cross-examination, he, too, expressed concern about the false entry:

Q. So given the hypothetical that [Beuttenmuller] provided for you, what effect does—what effect on your answer does the following change in facts have? That the money paid to [Billings] is not a brokerage commission because he's never seen the property. [Ra]ther the money is payment for another transaction having nothing to do other than the fact that—that the down payment is brought over? Does that change your opinion?

A. I'm sorry. You're saying that—

Q. Let me shorten the question. I apologize. Does the fact that the—that the brokerage commission that's reported, that's disclosed, is money paid to him for doing something else having nothing to do with the property. Does that change your opinion?

A. Not necessarily, if it was part of the transaction. A commission may be one of many factors built into the structure of a deal, when the broker is a principal in the transaction.

Q. So long as it's disclosed?

A. So long as it's disclosed.

Q. And it's not disclosed then what?

A. I understand it's probably against the law.

Of course, not only did the disbursement not, on its face, disclose that Billings was a principal in the Tanglewood deal, but it completely failed to disclose the transaction for which the payment was really being made: the Mansfield transaction. This very transaction illustrates what this witness agreed was "correct", namely, that, as a general proposition in the savings and loan industry, "failure of disclosure played a pretty important role in the inability of the examiners to find those transactions until long after they had deteriorated".

Also, although it should be obvious, one of Beuttenmuller's own witnesses, the former deputy savings and loan commissioner, described what a bank examiner would do if he discovered a cash-for-trash deal—as might have happened if the Mansfield transaction were disclosed in the important Tanglewood binder:

Q. But if you take the description of cash-for-trash that you gave us, if that's fully disclosed to examiners they're not going to allow that sale to stand, are they?

A. Well, if the sale has taken place they may object to it if they perceive it in that situation, yes.

Q. And the independent auditors aren't going to allow any profit that's reported to stand either, are they?

A. Probably not.

The majority suggests that the false entry that was made—the "commission" paid to a "purchaser"—was "equally atypical". Maj. Op. at 983. The relevance of this suggestion is not apparent; it does not seem that an "atypical" false entry can obviate the material effect of the false entry as measured against what should have occurred—a truthful entry. Moreover, Billings was not shown as a purchaser of the Tanglewood property; the purchaser was the "Southmeadow Joint Venture".[17] In the light of the false entry's

17. Perhaps the majority supposes that a diligent bank examiner could discern from other docu-

"natural tendency to influence, or be capable of affecting or influencing, a government function", *see Swaim,* 757 F.2d at 1534 (*quoting Markham,* 537 F.2d at 196), the false entry was material. Of course, this false entry provides further illumination of the intent of the parties to the transaction; if the exchange was "value for value", instead of "cash-for-trash", one wonders why the parties were so hesitant to risk calling attention to the Mansfield transaction in the Tanglewood binder.

## C.

The majority's reversal of Gill's convictions is predicated on its finding that the Mansfield/Tanglewood transaction was a lawful transaction. Maj. Op. at 981. As discussed, I disagree. Accordingly, I would affirm Gill's convictions as well.[18]

## II.

The scheme at issue is a modern, high stakes variation of a shell game, in which funds were moved about with blinding speed. When the participants were brought before the bar of justice several years later, the jury was there to observe the witnesses, receive the evidence and the court's charge, hear closing arguments, and reach a verdict.

In short, the jury was there; we weren't. We must apply the correct, deferential standard of review for a challenge to the sufficiency of the evidence. In so doing—examining the evidence in a light most favorable to the government, to include construing all reasonable inferences from the evidence in favor of the verdicts—I conclude that a rational jury could have properly reached the verdicts that it did. Therefore, I would affirm the convictions. Because the majority concludes otherwise, I must respectfully dissent.

ments in the closing binder that Billings was a partner in Southmeadow; this would be possible. However, such conjecture would not excuse the false statement that was made, nor would such conjecture provide outright the evidence of the tie-in between the two transactions as a truthful distribution entry in the Tanglewood binder would.

18. There was ample evidence to suggest that Gill participated in the transaction with an awareness of its illicit purpose. Among other things, Gill had authorized Ricky Ramsey, a real estate broker with whom he shared an office, to write a letter to another broker, stating that Billings and Gill "are willing to sell [Mansfield] at a discount from the appraisal and purchase some REO from Vernon Savings with part of the proceeds." A jury could infer from this letter (and testimony that Vernon was trying to sell REO) that Gill, in his desperate situation regarding Mansfield, was offering to serve as a straw man for another savings and loan seeking, like Shamrock, to rid itself of REO. Moreover, Gill was, of course, aware that the figures involved in the transaction were "backed into" to provide the necessary down payment to Shamrock. The jury had enough evidence to infer that Gill knowingly participated in Shamrock's "cash-for-trash" scheme.