**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 93-2877

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JOHN "JAY" F. BAKER, JR., JAMES A. GILBERT,
and TRENTON L. TORREGROSSA, JR.,

Defendants-Appellants.

Appeal from the United States District Court
for the Southern District of Texas

(August 2, 1995)

Before REYNALDO G. GARZA, HIGGINBOTHAM, and PARKER, Circuit Judges.

ROBERT M. PARKER:

Appellants John "Jay" F. Baker, Jr. (Baker), James A. Gilbert (Gilbert) and Trenton L. Torregrossa, Jr. (Torregrossa) appeal their convictions for bank fraud and related charges. We reverse in part and affirm in part.

## I. PROCEEDINGS BELOW

Baker, Gilbert and Torregrossa were indicted on charges of bank fraud in violation of 18 U.S.C. § 1344 (Count Two), misapplication of funds in violation of 18 U.S.C. § 657 (Counts Three - Twelve), knowingly making false entries in the books and

reports of a savings and loan, and unlawfully participating in loan proceeds in violation of 18 U.S.C. § 1006 (Counts Thirteen - Sixteen), and conspiracy to violate these statutes in violation of 18 U.S.C. § 371 (Count One). The indictment concerned conduct that began in December 1985, and continued through October 1987. After a two week trial the jury returned its verdict, finding Gilbert and Baker guilty on all charges, and finding Torregrossa guilty on Counts One, Two, Three, Four, Eight, Ten, Twelve, Fourteen, Fifteen and Sixteen.

## II. FACTS

Cornerstone Savings Association (Cornerstone), a federally insured savings and loan association in Houston, Texas, began operations in November 1985. Gilbert was chairman of the Board of Directors and owned approximately 70% of Cornerstone's stock. He signed a net worth maintenance agreement that guaranteed that he would make up any short fall in Cornerstone's net worth from his personal funds. He had been a builder and developer in the Houston area in the early 1980's. He was actively involved in the day to day operation of Cornerstone, and virtually every major decision required his approval.

Baker was a former football coach, a licensed Texas real estate broker, and original member of the Board of Directors of Cornerstone. He had met Gilbert in 1978 in connection with a real estate transaction. Torregrossa, a certified public accountant and licensed Texas real estate salesman introduced to Gilbert during the process of recruiting the original directors of Cornerstone,

2

served as a Cornerstone director from the beginning until April 1987. Torregrossa worked during this period as a real estate agent on behalf of Jay Baker & Co., a real estate brokerage company owned and operated by Baker.

Robert Lightfoot (Lightfoot), a certified public accountant, was the original president of Cornerstone, and also served on the Board of Directors. Lightfoot, along with Gilbert and Baker, served on Cornerstone's loan committee during this time period as well. He had no previous connection with the others, and was selected after an interview process because of his extensive experience in the savings and loan industry. Lightfoot was not indicted and testified at trial as one of two primary government witnesses.

In the late 1980's Houston was experiencing an economic slump that depressed the residential real estate market. Gilbert devised a plan for Cornerstone to purchase residential lots in partially completed subdivisions below their appraised value and realize a profit by providing financing for the initial lot purchase, the subsequent construction of single family houses, and eventually the sale of the completed homes to individuals and families. To effect this plan, Cornerstone formed the Monogram Group (Monogram), a wholly owned subsidiary of Cornerstone to market the completed houses. Builders who wanted to purchase lots and participate in the Cornerstone project joined Monogram. Many of the builders who joined Monogram had credit problems due at least in part to the depressed Houston housing market, and would have had trouble

3

finding financing from other sources.

Baker and Torregrossa negotiated the original lot purchases -- Baker naming "Amstar Investments, Inc." as the buyer; Torregrossa naming "Torregrossa, Trustee" as the buyer. After each transaction was approved by the Cornerstone Board of Directors, the contract was assigned by the named buyer to Cornerstone. Next, Cornerstone entered into contracts with one of the approximately fifty Monogram builders to buy the lots. At closing, the builder typically received one lot deeded directly to him from the seller for no additional consideration for each two lots purchased. The builder then borrowed money from Fallbrook National Bank, secured by the lots received from the seller, and paid these loan proceeds to Cornerstone as down payment. The builder borrowed the remaining 80% of the sales price from Cornerstone, secured by the lots deeded from the seller to Cornerstone to the builder. The proceeds from the 80% loans never left Cornerstone, as Cornerstone was both the seller and the mortgage holder. These transactions involved approximately 1,224.5 lots. Of these, 249 lots were deeded directly from the sellers to the homebuilders, 930 lots were sold to homebuilders through Cornerstone's 80% financing plan, and the remaining lots were sold to builders and financed 100% by Cornerstone, or were held in Cornerstone's real estate inventory.

Cornerstone purchased the lots for approximately $13 million and booked a profit by reselling them to the homebuilders for approximately $20 million. The contracts provided for a real estate commission of 3% - 6% to be paid to Jay Baker & Company,

4

which amounts were customary in the real estate industry, and were paid through the title company at the time of closing. Baker, Torregrossa and others associated with Jay Baker & Company performed the work normally performed by a real estate agent, and received compensation in the form of commissions. The commissions were transferred to Amstar, another company owned by Baker. Torregrossa ultimately received over $300,000 in commissions from Amstar for his role in the transactions. Baker, through Amstar, received approximately $500,000. Gilbert held an office in Amstar and received approximately $842,000 in what he termed "officer fees" for evaluating the various groups of lots for Amstar, in addition to the compensation he received from Cornerstone for performing similar functions. The government characterized these payments as "commissions," but Gilbert and Lightfoot both testified that Gilbert received no commissions from Amstar. The real estate commissions paid by Cornerstone were disclosed to Cornerstone's Board of Directors and to the regulators.

In December 1986, the FHLB conducted a field visit at Cornerstone and raised concerns about the commissions paid to Baker, because they gave the appearance of a conflict of interest in violation of § 571.7 of the insurance regulations. Cornerstone's Board of Directors responded, defending its policies and actions and pointing out that Torregrossa as well as Baker had received commissions. Further, Gilbert met with Baker and Torregrossa and the three decided that both Gilbert and Torregrossa would give up their positions as directors to avoid any question

5

about their compliance with the regulations.

In the summer of 1987, Karen Armitige (Armitige), an examiner of the Federal Home Loan Bank Board (FHLBB), conducted an examination at Cornerstone. While going through the transaction files for the lot purchases, she found that some files contained two sets of earnest money contracts and title policy commitments. One set listed a larger number of lots than the other set without a corresponding difference in the total purchase price for the properties. She and her assistants also found that the builders were making substantial down payments and establishing interest reserves. This fact raised questions because the builders' overall financial condition seemed weak and their bank balances did not appear sufficient to cover the down payments and interest reserves. Armitige asked one of Cornerstone's secretaries where the down payment funds had come from, and was given photocopies of the Fallbrook National Bank cashier's checks. She then took the files and the photocopies of the checks to Lightfoot, and asked for his help in understanding the transactions documented in the files. He told her he did not know, but would check with Gilbert and get back to her. Lightfoot told her the next day that Gilbert had taken the files to organize them. When Gilbert returned them to Armitige, only the documents reflecting the smaller number of lots were left in the files, because, as Lightfoot explained to her, those documents accurately reflected the number of lots actually purchased by Cornerstone.

Armitige testified that while doing research for a personal

project in the real estate deed records at Harris County Courthouse during the same time frame she ran across transactions deeding lots directly from the sellers to the Monogram builders. Again she went to Lightfoot and asked him to explain the transactions. He explained the program to Armitige in full. Armitige testified that once she understood the transactions, she was concerned that Cornerstone was "giving away institution assets."

Lightfoot's testimony generally agreed with Armitige's recitation of the transactions, but assigned a different motive to the players. Lightfoot testified that Gilbert planned to increase the value of Cornerstone as quickly as possible and then sell his interest in it. In Lightfoot's view, the problem with the plan was not that the builders received a windfall, but that Cornerstone inflated its own value by booking an instant profit from the sale of the lots at almost double their purchase price to high risk borrowers. In short, Lightfoot was critical not of the underlying transaction, but of the accounting procedures used in recording them.

Under Regulatory Accounting Principles (RAP), Cornerstone could have financed 100% of the lot loans and booked a profit at the inception of the loan. Under Generally Accepted Accounting Principles (GAAP), Cornerstone could not book a profit on a loan until it was paid in full unless the borrower made a 20% down payment. The down payment requirement allowed less risky loans to show as present profits, and riskier loans to show as potential future profit. The down payments from Fallbrook decreased

7

Cornerstone's risks, because the institution held 20% cash, and 80% real estate, instead of 100% real estate in a volatile market. The 20% down payments from the builders reduced Cornerstone's risk and allowed Cornerstone's books to reflect the highest possible value for a potential sale of the institution. Gilbert and the other directors of Cornerstone wished to satisfy the examiners that Cornerstone's risks were acceptable for federal insurance purposes, and the down payments were one element in their compliance with the regulations requirements.

Lightfoot testified that Gilbert said that he did not want the examiners to know that the down payments came from Fallbrook, because several of Cornerstone's directors also owned stock in Fallbrook. However, it was undisputed that Lightfoot and other Cornerstone employees disclosed this information to the examiners, and Fallbrook's involvement was clear from Cornerstone's records.

The central question in this appeal is whether Appellants' compensation, the real estate program itself and the accounting decisions made by the defendants were crimes, or whether they were merely an aggressive and complex marketing program designed to reap a legal profit in a risky market.

### III. SUFFICIENCY OF THE EVIDENCE

a. Standard of review.

All three defendants challenge the sufficiency of the evidence to support their convictions. We must decide whether a rational jury could find that the evidence established guilt beyond a reasonable doubt on each count of conviction. *United States v.*

8

*Frydenlund*, 990 F.2d 822, 824 (5th Cir. 1993). Every reasonable hypothesis of innocence need not be excluded by the evidence. *Id.* We view all reasonable inferences and credibility choices in the light most favorable to the jury's verdict. *Id.*

Sufficiency of the evidence in this case is not so much a question of credibility determinations, which are constitutionally entrusted to the jury and entitled to great deference, *see Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), as a mixture of fact and law: whether the actions and choices of defendants surrounding this real estate venture were proscribed by criminal statutes.

b. Bank fraud and misapplication.

Appellants were charged in Count Two of the indictment with Bank Fraud in violation of 18 U.S.C. § 1344 and in Counts Three through Twelve with Misapplication of Funds in violation of 18 U.S.C. § 657. Count Two charged Appellants with executing a scheme to defraud Cornerstone by "causing Cornerstone Savings to purchase 1224.5 residential lots and giving away 249 of the residential lots without compensation to Cornerstone Savings." Similarly, each of the misapplication counts charged Appellants with causing Cornerstone to pay for lots in a specific subdivision, which lots "were given to various builders without compensation to Cornerstone Savings." Accordingly, all eleven of these counts require proof that Cornerstone purchased and then disposed of the lots deeded directly from the developers/sellers to the builders without compensation. Appellants ask us to reverse their convictions

9

because proof at trial established that the lots passed to the builders only in combination with transactions where the builders purchased other lots at substantial profit to Cornerstone. They dispute the Government's contention that Cornerstone's assets were given away, because the overall effect of the transactions was a substantial profit to Cornerstone. We agree.

Citing *United States v. Saks*, 964 F.2d 1514 (5th Cir. 1992), the Government contends that the evidence supports the convictions because Appellants had a specific intent to deceive, for the purpose of causing some financial loss to another or bringing about some financial gain to themselves. *See id.*, at 1518. In *Saks* we affirmed a conviction under § 1344 based on evidence that the defendants, who were loan customers of the banks involved, defrauded federal regulators by concealing the involvement of another party in the loan transaction, as well as defrauding the banks of their money. The bank officers were not only aware of the scheme, but devised it in order to satisfy the regulators' insistence on their need for capital infusion, then convinced the defendant/loan customers to go along. The defendants claimed that there was insufficient evidence of a scheme to defraud the banks, because the bank officers knew about the plan, and the intent was to deceive the regulators. We rejected that argument, holding that the financial institution itself -- not its officers -- was the victim of the fraudulent scheme and that the officers' collusion in the crime did not excuse the defendants' fraudulent act of executing loan papers that concealed the true parties to the

transaction.

The Government attempts to bring this case under the purview of the *Saks* holding by offering examples of evidence that they contend proved that Appellants were not forthright in every aspect of their dealings. First, they argue that the jury could have inferred from confusion in the testimony of director Clint Hackney that the Board of Directors was not fully cognizant that Appellants were profiting from the commissions paid on the loan proceeds. It is beyond dispute that the directors were aware of the customary 6% real estate commissions paid in the lot transactions. Further, the conflict of interest policy that allowed such payments to the real estate company owned by Baker was adopted by the board. The regulators knew about these payments at least as early as the December 1986 field visit, and there was no evidence that the payments were concealed before or after that visit. Clint Hackney's ostensible confusion on the witness stand does not establish that Cornerstone's directors were unaware of the real estate commissions in the context of this record. Second, the Government points to the payments from Amstar to Gilbert denominated "officer fees." This evidence establishes a possible conflict of interest between Gilbert's goal of immediate personal gain and his goal of achieving profit for Cornerstone which, because he owned 70% of Cornerstone's stock, is perhaps accurately called long term personal gain. It is also evidence of another crime, discussed below. However, such evidence cannot substitute for evidence that Cornerstone was not compensated for its interest

11

in the 249 lots.  Third, they point to testimony that Gilbert told Cornerstone personnel to conceal any reference to Fallbrook's involvement with the Monogram sales transactions.  This evidence, likewise, does not inform the question of whether or not Cornerstone was adequately compensated.

*Saks* involved an executed loan document that everyone agreed failed to name the true parties to the loan, and the focus was on the intent of the parties to that document.  The Government asks us to apply the *Saks* analysis regarding the Appellants' fraudulent intent to this case, which misses the necessary focus of our inquiry: Was the real estate scheme itself unlawful?  We must answer that the evidence in this record would not allow a rational juror to find beyond a reasonable doubt that Appellants violated § 1344 or § 657 by giving away lots without compensation to Cornerstone.

c. False entries

To secure a conviction under 18 U.S.C. § 1006, the government must prove that (1) the defendant made a false entry in any book, report, or statement; (2) with intent to injure or defraud that bank or to deceive an officer of the bank or the regulators.  *See United States v. Cordell*, 912 F.2d 769, 773 (5th Cir. 1990).  The manifest purpose of this provision is to ensure that an inspection of a bank's books will yield an accurate picture of the bank's condition.  Thus, an omission of material information qualifies as a false entry.  *Id.* at 773.  To be material, the omission must have the capacity to impair or pervert the functioning of a

12

government agency. *United States v. Beuttenmuller*, 29 F.3d 973, 982 (5th Cir. 1994).

Counts Thirteen through Fifteen of the indictment allege that Gilbert, Baker and Torregrossa made false entries in Cornerstone's books "by failing to disclose the total number of lots that Cornerstone Savings purchased and paid for from [various sellers]." The Government contends that the evidence shows that the Appellants deliberately omitted the total number of lots purchased in order to deceive the examiners with respect to Cornerstone's actual financial health. The Government also argues that Cornerstone's records did not reflect the direct deeding of the lots to the builders, which in turn impacted the examiners review of the appropriate accounting entries as to those transactions.

Armitige testified that she found two sets of documents in some of Cornerstone's files, one set reflecting the larger number of lots, and another set for the same transaction showing the smaller number of lots. She raised questions with Lightfoot about which was the accurate information. After that discussion, the documents reflecting the larger number of lots were removed from the files, because they in fact did not accurately reflect Cornerstone's real estate holdings. Cornerstone did not receive any interest in Fallbrook lots, other than the cash down payment which was recorded in its books. Cornerstone's files originally showed both numbers, and after Armitige's inquiry showed the smaller, accurate number. In order to prove its theory of false entry violation, the government would have had to prove that

13

Cornerstone held some undisclosed interest in the disputed lots. Armitige testified that she understood at the close of her examination exactly what had occurred. If Cornerstone had recorded only the larger number of lots, and omitted the smaller number that were actually transferred to the institution as the government advocates, they risked a false entry charge. The most complete record was one that reflected both the originally negotiated deal and the subsequently consummated deal -- the very method being utilized by Cornerstone when Armitige arrived that the government demonized as "two sets of books." The second set of documents, removed from the file after Armitige's inquiry, was less accurate than the ones that remained, so that if Cornerstone was required to choose, as the Government contends, its choice did not amount to criminal false entry.

The evidence revealed that Gilbert at one point directed Cornerstone personnel to conceal any reference to Fallbrook's involvement with the Monogram sales transaction. However, this directive was allegedly motivated by his fear that Fallbrook's involvement was questionable due to Cornerstone directors owning Fallbrook stock. It will not support a conviction for failing to disclose the total number of lots purchased and paid for by Cornerstone, particularly in light of the testimony by the Government's witness establishing that documents reflecting both the total number, and the smaller number of lots were found in the files.

d. Illegal participation in profits

Count Sixteen charged that Appellants, with intent to defraud Cornerstone, the United States and the FHLBB, knowingly participated, shared and received money, profit and benefits of Cornerstone in that "each received a portion of the commissions paid on the purchase and sale of 1224.5 lots by Cornerstone," in violation of 18 U.S.C. § 1006. There was no dispute at trial that Baker and Torregrossa received commissions from the lot transactions. The record is sufficient to support the conclusion that Gilbert received compensation from Amstar for his role in the lot transaction, although Gilbert testified that that compensation was not a commission but a fee for officer services.

The central question on this Count is whether the commissions Cornerstone paid on the lot sales were illegal. They were fully disclosed within the customary range paid for real estate sales commissions and were paid pursuant to the contracts at the time of closing. The government takes the position that Cornerstone could have hired defendants or some other real estate professionals, paid them a salary and required that they do the real estate work necessary for the transactions without a commission. If such individuals were available for a salary of $50,000 each, as the Government contends, Cornerstone could have saved over $1 million in commissions. However, it is not illegal for real estate professionals to work on a commission basis rather than for a salary, nor is it illegal for a savings and loan to use commissioned agents instead of salaried employees. Most importantly, it is far from certain, based on this record, that a

15

person who was willing to work for a $50,000 salary in Houston in the 1980's would have the knowledge and skill necessary to find 1224.5 developed residential lots in Northwest Houston, negotiate the fire sale prices Cornerstone received in the deals, and put together the sales and marketing package executed by Appellants. We therefore conclude that the Government's speculation that Cornerstone could have purchased the lots without paying real estate commissions does not amount to sufficient evidence that the Appellants participated in Cornerstone's profits.

A more difficult question is presented by the money paid by Amstar to Gilbert. The evidence supports a finding that Gilbert received compensation from Amstar for his role in selecting and negotiating the deals on the Cornerstone lots, which the government relies on to establish Gilbert's illegal participation in Cornerstone's profits. Gilbert points out that Amstar charged Cornerstone a reasonable, customary and legal 3 - 6% commission; the record reveals no evidence that the commissions were outside the normal rate for real estate transfers, were in fact not paid on the closing of such transfers, or were in any other way irregular.

We conclude that the record supports a finding that Gilbert's income from Amstar was illegal participation in Cornerstone's profits. The jury may well have found that Gilbert performed no service for Amstar other than his work performed on behalf of Cornerstone, but received the payments as a kickback rather than fees for services rendered as an officer. Likewise, a rational juror could have concluded that Baker aided and abetted Gilbert in

16

this scheme, as the money flowed through a company wholly owned by Baker, and could not have been paid to Gilbert without Baker's complicity.  On the other hand, there is no support in the record for any theory of Torregrossa's guilt on Count Sixteen.  His commissions were legally earned, and the Government did not implicate him in Amstar's payments to Gilbert.

e. Conspiracy

Count One of the indictment charged Appellants with conspiracy to commit the various crimes charged in the remainder of the indictment.  In order to convict Appellants of conspiracy, the Government must prove that (1) two or more people agreed to pursue an unlawful objective; (2) the individual defendant voluntarily agreed to join the conspiracy; and (3) one or more of the members of the conspiracy performed an overt act to further the objectives of the conspiracy.  *United States v. Beuttenmuller*, 29 F.3d 973, 978-79 (5th Cir. 1994).  The record is sufficient to sustain the conspiracy convictions of Gilbert and Baker, based on their agreement and overt acts relating to the illegal participation in profits alleged in Count Sixteen.

However, the record does not support Torregrossa's conspiracy conviction.  Where the government fails to prove that the object of the conspiracy was unlawful, the conviction for conspiracy must be reversed.  *Id.* at 981.  Under *Beuttenmuller*, we must examine the underlying transaction and determine whether there was sufficient evidence to allow a jury to conclude beyond a reasonable doubt that the alleged object of the conspiracy was illegal.  That case, like

17

the one before us, concerned a risky and complex real estate transaction involving the transfer of residential real estate lots in the depressed 1980's Texas economy, undertaken by a federally insured savings and loan association that ultimately failed. This Court, after examining the component parts of the real estate transfer, determined that the defendants had benefited themselves financially, taken risks and lost money, but had not violated any law in the process, and therefore reversed their conspiracy convictions for insufficiency of evidence. We find that *Beuttenmuller*'s analysis controls the question posed by this case.

The examiner's characterization that Cornerstone gave its assets to builders without compensation indicates her lack of understanding of the structure of the transaction. The buy-two-get-one-free packaging of the lot transactions was economically advantageous to the sellers, to Cornerstone and to the buyer/builders. Such packaging is not against the law, nor is it fraudulent. Its innovative, nontraditional application to residential real estate lots is likewise not illegal or fraudulent. The evidence established that Cornerstone's residential real estate program was building and selling homes in Houston in an economic climate that had suffocated many less aggressive approaches.

Government regulators have an important role in enforcing statutes and regulations that protect investors and insurers. However, they exceeded that role in this case by forcing personal fears about the wisdom of new ventures and risk taking on business people who acted within the confines of the laws and regulations.

18

Gilbert, who the Government alleged benefitted more than the other players, in fact risked the most and lost the most. In hindsight, it is impossible to say whether that loss was inevitable or was simply the by-product of overzealous regulators. Because the Government failed to prove that Torregrossa agreed to any unlawful objective, his conspiracy conviction must be reversed.

### f. Conclusion

Based on the foregoing, we conclude that there was sufficient evidence to support Gilbert's and Baker's convictions under Counts One and Sixteen. There is insufficient evidence to support the other convictions, which we therefore reverse.

## IV. Statute of Limitations

Appellants argue that the retroactive effect of 18 U.S.C. § 3293, which Congress enacted in 1989 to provide a new ten year statute of limitations on certain financial institution offenses, violates the Ex Post Facto Clause of the United States Constitution. This issue was settled against Appellants in *United States v. Brechtel*, 997 F.2d 1108 (5th Cir.), *cert. denied*, ___U.S.___, 114 S.Ct. 605 (1993).

## V. Reversal and Remand

All of Torregrossa's convictions are REVERSED. All of Gilbert's and Baker's convictions are REVERSED, with the exception of the convictions under Counts One and Sixteen, which are AFFIRMED. We find no merit in the other grounds of error raised by Gilbert and Baker as they specifically relate to the affirmance of the convictions on Counts One and Sixteen. The sentences are

19

VACATED and the case is REMANDED so that the district court can resentence Gilbert and Baker.