**UNITED STATES of America**

v.

**Kenneth SCHNITZER, Phillip Barber & Walter Ross.**

**Criminal No. 95–166.**

United States District Court,
S.D. Texas,
Houston Division.

Aug. 20, 1996.

Fred H. Dailey and Cynthia DeGabrielle, Office of the U.S. Attorney, Houston, TX, for U.S.

Michael W. Ramsey, Houston, TX, for Defendant Schnitzer.

Robert C. Bennett and Marjorie A. Meyers, Bennett Secrest & Meyers, Houston, TX, for Defendant Barber.

Charles M. Meadows, Jr.. and M. Todd Welty, Meadows, Owens, Collier, Reed, Cousins & Blau, L.L.P., Dallas, TX, for Defendant Ross.

## ORDER

HITTNER, District Judge.

Pending before the Court are the following motions: Renewed Motion for Judgment of Acquittal or, in the alternative, Motion for New Trial filed by Ross; Renewed motion for judgment of acquittal or, in the alternative motion for new trial filed by Schnitzer and Barber and joined by Ross; Renewed Motion to Dismiss for Preindictment Delay filed by defendants; and the Motion for New Trial Based on Exclusion of Polygraph Evidence filed by Schnitzer. Having considered the motions, the submissions on file, the arguments of counsel presented before the Court on August 12, 1996, and the applicable law, the Court enters the following Memorandum Opinion and Order.

Defendants were charged with the following four offenses: 1) conspiracy in violation of 18 U.S.C. § 371;[1] 2) misapplication of bank funds in violation of 18 U.S.C. § 657;[2] 3) false entries in bank records in violation of 18 U.S.C. § 1006;[3] and 4) bank fraud in violation of 18 U.S.C. § 1344.[4]

### Legal Standards

■■■■ A trial court must allow a guilty verdict to stand if a rational jury "could have found that the government proved all essential elements of the crime beyond a reason-

able doubt." *Id.* (citation omitted). However, when "the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, the conviction should be reversed.". *United States v. Pennington,* 20 F.3d 593, 597 (5th Cir.1994).

■■■■ With respect to motions for new trial, Fed.R.Crim.P. 33 authorizes a district court to set aside a verdict when the interest of justice so requires. In other words,. if after weighing the evidence, the court determines that the verdict is against the great weight of the evidence, then a new trial may be ordered. *United States v. Evans,* 42 F.3d 586, 593 (10th Cir.1994); *United States v. Rothrock,* 806 F.2d 318, 321 (1st Cir.1986). Such decision rests squarely within the discretion of the trial court. *United States v. Baytank (Houston), Inc.,* 934 F.2d 599, 617–18 (5th Cir.1991).

Defendants base their motion for judgment of acquittal or new trial on several theories. First, they argue that the government failed to establish beyond a reasonable doubt that any of the defendants acted with the requisite intent or knowledge. Defendants also contend that the evidence is insufficient to show beyond a reasonable doubt that the transaction at issue was not a value for value transaction. Similarly, defendants contend that the evidence is insufficient to show that the defendants made a material false entry.

In 1986, Schnitzer, Barber, and Ross were either officers or directors of the Century Corporation and its wholly owned, and feder-

---

1. The elements of this offense are: an agreement between two or more persons; to commit a crime against the United States; and an overt act committed by one of the conspirators in furtherance of the agreement. *United States v. Mackay,* 33 F.3d 489, 493 (5th Cir.1994).

2. The elements of this offense are: the defendant was an officer, director, agent, or employee; of a savings and loan authorized under the laws of the United States; who knowingly and willfully misapplied the funds of the institution; and who acted with intent to injure or defraud the institution. *United States v. Parks,* 68 F.3d 860, 863 (5th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 825, 133 L.Ed.2d 768 (1996).

3. The elements of this offense are that defendant was an officer, director, agent, or employee; of a savings and loan authorized under the laws of the United States; who knowingly and willfully made or caused to be made a false entry concerning a material fact in a book, report, or statement of the institution; and who acted with intent to injure or defraud the institution or any of its officers, auditors, examiners, or agents. *Parks,* 68 F.3d at 865.

4. Proof of this offense requires a showing that the defendant knowingly executed or attempted to execute a scheme or artifice to defraud a financial institution. 18 U.S.C. § 1344(1).

ally insured, subsidiary, BancPLUS Savings Association ("BancPLUS"). One of BancPLUS's assets was a piece of real estate located in Houston, Texas. The land was undeveloped and consequently, was not generating any income for the savings and loan. Therefore, the decision was made to sell the property. Harold "Hal" Pettigrew, a Dallas businessman and defendant in this action,[5] expressed interest in purchasing the property. However, as part of the deal, Pettigrew required that BancPLUS purchase other property—a parcel of land located in Lewisville, Texas, near Dallas.

The structure of the transaction was as follows: a BancPLUS subsidiary, Magnolia Properties Limited ("MPL"), sold the Houston property to Pettigrew's company, California–Texas Properties ("Cal–Tex"), for $46 million. Cal–Tex made a downpayment of $9 million. In return, another BancPLUS subsidiary, Magnolia Investment Properties Inc. ("MIPI"), purchased the Lewisville land from a company named Scott's Cattle Company ("Scott's Cattle"), for $26 million. MIPI made a downpayment of $15 million. Of this $15 million, $9 million was wired, at closing, from Scott's Cattle's account to Cal–Tex's account to fund the downpayment on the Houston property. As a result of this transaction, BancPLUS recorded the sale and the purchase on its books as two separate transactions. The sale of the Houston property resulted in a profit to the institution.

As it turns out, Scott's Cattle was a nominee corporation for Pettigrew; that is, Pettigrew controlled Scott's Cattle. However, Pettigrew's control was not evidenced in the typical manner. Pettigrew was not a shareholder, director, or officer in Scott's. Instead, he executed a trust agreement, or a nominee agreement, that authorized Scott's Cattle to execute the transaction on his behalf. After the closing of the two land sales, Scott's Cattle wired the remaining $6 million ($15 million downpayment by MIPI, less the $9 million wired to Cal–Tex) to Pettigrew's account. It is undisputed that none of the money either paid out by MIPI as a down-

payment, or received by MPL from Cal–Tex was paid to any of the bank defendants.

■ Defendants rely principally on *United States v. Beuttenmuller*, 29 F.3d 973 (5th Cir.1994) in support of their argument that they are entitled to judgment of acquittal. In *Beuttenmuller*, the Fifth Circuit reversed the convictions of two individuals charged with similar offenses as those charged in this case. Underlying the charges in *Beuttenmuller* was a transaction between a savings and loan association, Shamrock Federal Savings Bank, and a joint venture of two individual investors known as the Mansfield 150 Joint Venture. The basic facts of *Beuttenmuller* are as follows. After a foreclosure, Shamrock had on its books a parcel of property in Austin, Texas known as the Tanglewood property. The property consisted of undeveloped residential lots and did not generate any income for Shamrock. Accordingly, Shamrock desired to sell the property in order to improve its balance sheet. Similarly, the Mansfield 150's sole asset was a parcel of undeveloped and non-income producing land, encumbered by substantial debt for which the owners were personally liable. The owners desired to sell this land in order to improve their financial health. Shamrock and the Mansfield 150 were brought together by a real estate consultant and the two entities agreed to the following transaction:

(a) Shamrock, through a subsidiary, paid $753,290.63 in cash for a 45% interest in the Mansfield 150. Shamrock further agreed to pay all future financing payments arising from the property owned by the joint venture.

(b) After closing, a new joint venture created by the two Mansfield 150 investors, Southmeadow Joint Venture, purchased the Tanglewood property from Shamrock for $2,725,000.00. Southmeadow made a 20% downpayment of $555,000.00 funded by the $753,290.63 paid by Shamrock for its share of the Mansfield 150.

As a result of this transaction, Shamrock was able to report a $163,000.00 profit on the sale of the Tanglewood property. This prof-

---

5. Pettigrew's trial was severed from that of the other defendants. Pettigrew was originally set for trial before the bank defendants. However, Pettigrew's subsequent health problems prevented his trial from going forward as scheduled.

it was approximately 25% of the total profit reported by Shamrock for that fiscal year. Two years later, Shamrock was declared insolvent. It had paid large sums of money for the maintenance of both the Mansfield property and the Tanglewood property. Sometime later, Shamrock foreclosed on the Tanglewood property and once again the property was classified as real estate owned by the savings and loan. *Id.* at 975–78.

The Fifth Circuit identified the pivotal issue in *Beuttenmuller* as whether the transaction described above was a value-for-value transaction or whether it was a so-called "cash-for-trash" transaction. If the purchase of the Mansfield property was no more than a scheme to give cash to the purchasers of the Tanglewood property in order to finance the purchase, then the transaction would be illegal. However, if the purchase of the Mansfield property was a legitimate investment, then the transaction is legitimate. *Id.* at 979–80. Shamrock's purchase constitutes a purchase of insufficient value if the Mansfield property either had no value, or value so low that it was clear that the deal was a sham. *Id.* at 980. In deciding this question, the appeals court examined the evidence relating to valuation of the Mansfield property and found it inadequate to support the government's theory that the arrangement was no more than a cash-for-trash scheme. Specifically, the court noted that the only evidence in the record concerning the value of the Mansfield property established an appraised value of at least $4 million. Thus, Shamrock's payment of $753,290.63 for a 45% interest in the land was a legitimate transaction. *Id.* at 980–81.

The present case presents the same question addressed by the court in *Beuttenmuller*. If BancPLUS received fair value when it purchased the Lewisville property, then the transaction is not violative of any criminal statute. The evidence in the record regarding the value of this property is mixed. The government presented evidence that

Scott's Cattle purchased the Lewisville property from a third party, Lintex, either the same day that it resold it to the BancPLUS subsidiary or the Friday before the sale. Scott's Cattle paid $13 million to Lintex for the land. The government argues that this purchase price is evidence that the Lewisville property was not worth the $26 million that BancPLUS paid for it. Defendants however, contest the value of this evidence in light of the appraisal evidence presented at trial. Robert Brandt, an appraiser employed by The Appraisal Group,[6] testified that the Lewisville property was worth $35 million. This appraisal was based on an "as-is" assessment of the land's value, that is, without any improvements to the property. In addition, defendants did not merely rely on a written appraisal without making any efforts to personally satisfy themselves as to the value of the property. Instead, they undertook extensive due diligence including a visit to the property, examination of comparables to the Lewisville property, and retention of an engineering firm to evaluate certain issues relating to the development of the land. Further, with regard to Lintex's $13 million sales price, there was evidence that Lintex was eager to sell all of its undeveloped land, that its initial pricing of the land was between $18 and $20 million, that the land was never listed on the open market, and that Lintex accepted the first offer it received. Finally, it is undisputed that no evidence was presented that any of the bank defendants knew that the land had been previously sold for $13 million.

In addition, the evidence establishes that with regard to the Cal–Tex transaction, the bank believed the sale had economic substance. Barber contacted Pettigrew's bank to determine his credit-worthiness and discovered that he maintained eight-digit bank account balances. Pettigrew conducted due diligence on the Houston property based on information provided him by BancPLUS employees and took a helicopter ride to view the

---

6. The evidence at trial showed that The Appraisal Group was paid $5,000 by Pettigrew for its services. However, the evidence further showed that it was not particularly unusual for a seller to pay the appraiser. Moreover, even if one assumes that the value may have been overstated

based on who funded the appraisal, it is unlikely that an appraiser as respected as Brandt would overstate the property's value to the extent necessary to give credence to the government's theory that the property was worth at best, $13 million.

property. Thus, the evidence shows that the Cal–Tex purchase of the Houston property was a transaction with economic substance.

In summary, the evidence in this case demonstrates that the only definitive evidence of value that the defendants were aware of at the time they bought the Lewisville property was the appraisal by The Appraisal Group. This appraisal indicates that the bank was receiving value in exchange for its $26 million. Under the standard set forth in *Beuttenmuller*, the value of the Lewisville property was neither zero nor so low that the transaction was clearly a sham. *Beuttenmuller*, 29 F.3d at 980. Since the bank received fair value for its money, there was no fraud involved in the transaction and the defendants are entitled to a judgment of acquittal on the charge of bank fraud. Similarly, since the transaction was a legitimate value-for-value transaction, defendants are entitled to judgment of acquittal on the charge of misapplication of bank funds.

■ With regard to the false entries count, the government's allegation is that the bank records did not properly reflect the transaction as it occurred, in violation of 18 U.S.C. § 1006. The purpose of the false entries statute is to ensure that "an inspection of a bank's books will yield an accurate picture of the bank's condition." *United States v. Baker*, 61 F.3d 317, 323 (5th Cir. 1995). Thus, the inquiry is whether defendants omitted materially false information. *Id.* An omission is material if it has the "capacity to impair or pervert the functionally of a government agency." *Id.* (citing *Beuttenmuller*, 29 F.3d at 982).

The government contends that one material omission is the fact that the transactions at issue were recorded separately as an unrelated sale and purchase rather than recording the two as one linked transaction.[7] Similarly, the government contends that the defen-

dants made a material omission in failing to record the fact that the sale of the Houston land was 100% financed rather than only 80% financed. In support of this contention, the government relies principally on the testimony of Vivian Carlton, a bank examiner who examined the books of BancPLUS after it was placed in receivership. Carlton's testimony was that the manner in which the bank handled the sale and purchase was improper.

■ As an initial matter, the Court notes that the manner in which BancPLUS recorded the transactions was technically accurate. Cal–Tex was the purchaser of the Houston property and it is undisputed that this transaction was correctly reported. In the second transaction, Scott's Cattle was the actual seller of the Lewisville property and this is how the transaction was reported as well. True, Scott's Cattle was acting on behalf of Pettigrew, however, Scott's Cattle held record title to the property and was the only party that could have passed good title. Furthermore, Carlton testified that based on the documentation available to her at the bank, she was able to ascertain the circular nature of the transaction. She did this by examining the closing binders of the two transactions and the affidavit signed by Pettigrew.[8] Under *Baker*, so long as the files of the bank contain all material information known to defendants at the time of the transaction, there can be no conviction based on false entries. *Baker*, 61 F.3d at 323–24.

■ Thus, the issue is whether the government has shown beyond a reasonable doubt that defendants knew of the falsity of Pettigrew's affidavit and of his involvement with Scott's. If no, then defendants are entitled to an acquittal. If yes, then the next inquiry is whether, given that knowledge, the omission of Pettigrew's direct control over Scott's Cattle was material. If that informa-

---

7. Count 3 of the indictment charges that defendants:

knowingly did make false entries in the books, reports and statements of BancPLUS Savings Association by stating falsely in such books, reports and statements that BancPLUS Savings Association and its subsidiaries had purchased land from Scott's Cattle Company when in truth Schnitzer, Barber and Ross,

defendants, knew the true seller of the land was Pettigrew.

8. While the testimony was somewhat inconsistent on this point, ultimately Carlton was able to conclusively state that she discovered Pettigrew's affidavit in the records of BancPLUS and not in the title company records as she first stated.

tion was not material, then defendants are entitled to an acquittal.

With regard to defendant's knowledge of Pettigrew's involvement, the Court finds that the government failed to prove beyond a reasonable doubt that defendants knew of this fact, and that therefore no rational trier of fact could have found against defendants on this point. There is no direct evidence on this point and all the circumstantial evidence relied upon by the government provides equal support for defendant's theory of the case. For example, the fact that Pettigrew's purchase of the Houston property was conditioned on the bank's purchase of another property is no evidence of guilty knowledge. In addition, the defendants sought to reassure themselves that Pettigrew was not connected to Scott's Cattle by obtaining an affidavit to this effect. While the government views this action as an attempt by defendants to cover their backs, this action provides weight to defendants' position that they attempted in good faith to determine whether Pettigrew had any impermissible relation to Scott's Cattle. This view is bolstered by the testimony of Bruce Merwin that the affidavit was the only means possible for BancPLUS to assure themselves that Pettigrew was not an owner of Scott's Cattle. In sum, "the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence." *Pennington,* 20 F.3d at 597.

 In addition, notwithstanding whether defendants knew of Pettigrew's relationship to Scott's Cattle, it is not clear that this knowledge impacts the proper accounting treatment. Carlton testified that the transaction was booked improperly because it was not recorded in accordance with a certain accounting standard, FASB [9] 66. Under this standard, a linked sale and purchase would have to be booked as a swap, and the profit recorded by the bank would be and incorrect treatment. Yet it is well established that a violation of an accounting standard, or even a civil regulation does not amount to a criminal offense. *United States v. Christo,* 614 F.2d 486, 492 (5th Cir.1980). More importantly however, under the accounting standards applicable to BancPLUS in 1986, its recordation is not improper.

FASB 66 was not adopted in the savings and loan industry until January 1989. *See,* 52 Fed.Reg. 18340 (May 15, 1987) (adopting FASB 66 effective January 1, 1988); 52 Fed. Reg. 39068 (October 20, 1987) (delaying adoption of FASB 66 effective January 1, 1989). Instead, the applicable accounting standards were provided by Regulatory Accounting Principles or RAP. Under RAP, a savings and loan was entitled to book a profit on a sale of land, even if that institution provided the financing for the sale. 46 Fed. Reg. 54567 (November 3, 1981).[10] *See also Baker,* 61 F.3d at 321 (stating that under RAP, a savings and loan association was entitled to 100% finance the sale of land and still book a profit on the sale). Accordingly, the Court determines that defendants are also entitled to an acquittal of the false entries count.

As the Court determines that judgments of acquittal are warranted on all counts against all defendants, the Court also finds that a new trial is appropriate for the same reasons underlying the Court's decision to grant judgments of acquittal. With respect to the motions filed by defendants seeking dismissal

---

9. FASB is an acronym for Financial Accounting Standards Board.

10. Specifically, the pertinent regulation states: Section 563.23-1(f) of the Board's regulations provides that an insured institution may recognize profit from the sale of real estate only to the extent cash is received from the purchaser. These accounting rules effectively prevent the full recognition of profit in any sale that is financed by the insured institution. . . .

 Since an institution's principal business activity is providing financing for the purchase and sale of real estate, it is the Board's view that it

 is inconsistent to prevent an institution or its service corporation from recognizing the profit earned from the sale of real estate merely because the institution provides the financing for the sale. The Board therefore proposes to amend its rules to provide that the fill (sic) amount of profit on certain sales of real estate may be recognized in the period of sale.

 In this passage, Board refers to the Federal Home Loan Bank Board and institution refers to institutions insured by the Federal Savings and Loan Insurance Corporation.

based on preindictment delay and a new trial based on the exclusion of polygraph evidence, the Court maintains its earlier rulings. Based on the foregoing, the Court

ORDERS that the Renewed Motion for Judgment of Acquittal or, in the alternative, Motion for New Trial filed by Ross is GRANTED; Ross is acquitted on all charges and should the judgment of acquittal be reversed, Ross is granted a new trial; the Renewed Motion for Judgment of Acquittal or, in the alternative Motion for New Trial filed by Schnitzer and Barber and joined by Ross is GRANTED; Schnitzer and Barber are acquitted on all charges and should the judgment of acquittal be reversed, Schnitzer and Barber are granted new trials; the Renewed Motion to Dismiss for Preindictment Delay filed by defendants is DENIED; and the Motion for New Trial Based on Exclusion of Polygraph Evidence filed by Schnitzer is DENIED.

As the Court has granted the motions for judgment of acquittal, the Court hereby

ORDERS that judgment of acquittal be entered on all counts pending against defendants Kenneth Schnitzer, Phillip Barber, and Walter Ross.